[S.F. No 25050. Feb. 23, 1989.]

EDDIE KELLER et al., Plaintiffs and Appellants, v.
THE STATE BAR OF CALIFORNIA et al., Defendants and
Respondents.

COUNSEL

Ronald A. Zumbrun, John H. Findley and Anthony T. Caso for Plaintiffs and Appellants.

Hufstedler, Miller, Carlson & Beardsley, Hufstedler, Miller, Kaus & Beardsley, Robert S. Thompson, Laurie D. Zelon, Mary E. Healy, Judith R. Starr, Herbert M. Rosenthal, Truitt A. Richey, Jr., and Magdalene Y. O'Rourke for Defendants and Respondents.

Joseph A. Ball, Ball, Hunt, Hart, Brown & Baerwitz, Alvin H. Goldstein, Jr., Goldstein & Phillips, James J. Brosnahan, Edmund G. Brown, Sr., Robert E. Cartwright, Sr., Leonard M. Friedman, David M. Harney, Kurt W. Melchior, David C. Phillips, Roger S. Ruffin, Daniel M. Sklar, Daniel U. Smith, Robert L. Winslow, Howard, Rice, Nemerovski, Canady, Robertson & Falk, Jerome B. Falk, Jr., John T. McTernan, Jerry P. Gordon, Margolis, McTernan, Scope & Epstein, Horvitz, Levy & Amerian, Ellis J. Horvitz, Peter Abrahams, Munger, Tolles & Olson, Bradley S. Phillips, Altshuler & Berzon, Fred H. Altshuler and Marsha S. Berzon as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BROUSSARD, J.**—This suit attacks the use of dues collected by the State Bar of California to finance lobbying, amicus curiae briefs and other activities, including election campaign activities, politically or ideologically objectionable to plaintiffs. Upon analysis of the constitutional status and legislative structure of the State Bar, we conclude that the State Bar may use dues to finance any activity, except election campaigning, which is germane to its statutory mission to promote "the improvement of the administration of justice." (Bus. & Prof. Code, § 6031, subd. (a).)[1]

Acting pursuant to its statutory authority, the State Bar for many years has lobbied the Legislature and other governmental agencies, filed amicus curiae briefs in pending cases, held an annual conference of delegates at which issues of current interest are debated and resolutions approved, and engaged in a variety of education programs. In 1982 the State Bar publicized the inaugural speech by its new president, Anthony Murray, in which he addressed the confirmation of appellate justices in the impending election. The State Bar subsequently disseminated material on that subject to local bar associations and other organizations.

All of these activities were financed primarily from membership dues, as are all bar activities except the bar examination. The State Bar levies

---

[1] Unless otherwise indicated, all California statutory citations are to the Business and Professions Code.

membership dues pursuant to statutory authority (§ 6140) subject to a maximum limit set annually by the Legislature. Every attorney engaged in active practice in California is required to be a member of the bar (§§ 6125-6126) and to pay the dues assessed; a refusal to pay results in the suspension of membership (§ 6143), which deprives the attorney of the right to practice law in California (§ 6225).

Plaintiffs contend that the activities in question constitute the advancement of political and ideological causes, and cannot constitutionally be financed from mandatory dues. This is an issue of first impression in this state. Courts of some other jurisdictions have limited the use of bar dues, but there is no consensus concerning those limits.

When we set out to analyze the issue, we are confronted immediately with two competing paradigms. The State Bar argues that we should view it as a government agency, which may use revenues from any source for any purpose within the scope of its authority. Plaintiffs, on the other hand, argue that we should view the bar as a labor union or private association whose right to use dues money is restricted by constitutional principles.

We believe the governmental agency paradigm more closely fits the case of the California State Bar. Accordingly, we conclude the bar may use dues to finance all activities germane to its statutory purpose, a phrase which we construe broadly to permit the bar to comment generally upon proposed legislation or pending litigation. By analogy to governmental agencies, however, the bar may not engage in election campaigns; thus certain of the activities in connection with the 1982 election exceeded its statutory power.

I. *Proceedings in This Action.*

Plaintiffs, 21 members of the State Bar, filed suit against the bar and its Board of Governors. Their complaint alleged that "[t]he State Bar of California, by and through its Board of Governors, has expended and will continue to expend substantial portions of the revenues derived from . . . mandatory dues payments to advance political and ideological causes, including, but not limited to: "a. lobbying the California State Legislature on various matters . . . ;

"b. submitting briefs amicus curiae in various cases . . . ;

"c. financing meetings of the Conference of Delegates at which political and ideological causes are advanced . . . ;

"d. publicizing the political and ideological speeches of its president, Anthony M. Murray . . . ;

"e. financing a so-called 'public information' project designed to dissemi-nate to the general public a particular ideology regarding judicial retention elections. . . ."

Plaintiffs then alleged that they do not subscribe to many of the political and ideological causes promoted by the bar, and object to the use of manda-tory dues to advance any of the political and ideological views of the Board of Governors or the conference of delegates. They sought a declaration that defendants have violated their constitutional rights, an injunction restrain-ing defendants from using bar dues or the name of the State Bar to advance political and ideological causes or beliefs, and an injunction compelling defendants to reimburse the bar for all funds expended for political and ideological purposes since September 12, 1982.

Plaintiffs attached a partial list of the bills which the bar has lobbied for or against, of the cases in which it has appeared as amicus curiae, and of resolutions adopted by the conference of delegates. They also attached a copy of Anthony Murray's inaugural address when he became president of the bar on September 12, 1982, a press release describing that address, and a later press release dated October 8. (Although the complaint referred to "speeches," the September 12 speech is apparently the only one at issue.) Finally, plaintiffs attached a copy of an educational packet entitled "The Case for an Independent Judiciary" distributed by the bar in October of 1982. The packet included a copy of Murray's inaugural address, a resolu-tion of the Board of Governors, a sample speech, fact sheets on crime and conviction rates, judicial retention elections, and judicial performance, and suggestions for speech fora and media coverage.

Defendants answered, admitting that they have used dues to finance all of the described activities, but maintaining that such expenditures did not violate plaintiffs' rights.[2] Defendants then moved for summary judgment or adjudication of issues. In support, they submitted declarations which de-scribed the bar's legislative and amicus curiae program and asserted that the bar usually acted only in matters which affect the bar itself, the attorney-client relationship, or the administration of justice. In lobbying or filing amicus curiae briefs the bar's representatives purport to act only on behalf of the State Bar, and not to represent the views of each of its members. Plaintiffs filed a cross-motion for summary judgment, but submitted no declarations.

The trial court granted summary judgment for defendants, finding that the State Bar was a governmental agency authorized to do the acts in

---

[2] Defendant Phyllis Hix answered separately, asserting only the defense of failure to state a cause of action. She is not involved in this appeal.

question. The court further found that the plaintiffs had failed to show that the individual defendants acted without due care or in bad faith.

The Court of Appeal reversed. The majority opinion by Justice Sparks divided State Bar activities into two categories. The first, regulatory activities, included the testing and admission of bar applicants and the disciplining of members. These activities, the Court of Appeal said, were akin to those of a governmental agency. The bar's administration-of-justice function—a function which included all the activities here challenged—it found akin to the actions of a labor union. Such action it held, could be financed from mandatory dues only if the particular action in question served a state interest important enough to overcome the interference with dissenters' First Amendment rights.[3] Each lobbying activity, it said, and each amicus curiae brief, would have to be examined, with the State Bar bearing the burden to justify its action.

The Court of Appeal further held that the Murray speech and educational packet constituted election campaigning unauthorized by statute. It further found that the Board of Governors' approval of such unauthorized expenditures may subject its members to personal liability, and raised a triable issue concerning their good faith and exercise of due care. We granted the defendants' petition for review.

## II. *Structure and Function of the State Bar.*[4]

Although the parties submitted much documentation in support of and in opposition to the respective motions, there is no real factual dispute about the State Bar and its activities. ■ As we recently recounted, "[i]n 1927, the Legislature adopted the State Bar Act (Bus. & Prof. Code, § 6000 et seq.) establishing 'what is known as an "integrated" bar, i.e., an organization of members of the legal profession of the state with a large measure of self-government, performing such functions as examining applicants for admission, formulating rules of professional conduct, disciplining members for misconduct, preventing unlawful practice of the law, and engaging in study and recommendation of changes in procedural law and improvement of the administration of justice.' (1 Witkin, Cal. Procedure (1970 ed.) Attorneys, § 157, p. 168.)" (*Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 557 [216 Cal.Rptr. 367, 702 P.2d 525].)[5] Thus, the State Bar is authorized to establish

---

[3] Justice Puglia, concurring, maintained that the bar must prove that financing such activities from mandatory dues served a compelling state interest that cannot be achieved by less restrictive means.

[4] The discussion in this section is adapted from the Court of Appeal opinion of Justice Sparks.

[5] "An integrated bar is a compulsory association of attorneys that conditions the practice of law in a particular state upon membership and mandatory dues payments." (Note, *First*

an examining committee to "examine all applicants for admission to practice law" and thereafter to "certify to the Supreme Court for admission those applicants who fulfill the requirements. . . ." (§ 6046, subds. (a), (c).) Under the board's auspices, local administrative committees may investigate complaints about the conduct of members and may thereafter forward reports and recommendations to the board for action. (§ 6043, subds. (a), (c).) After a hearing, the board "has the power to recommend to the Supreme Court the disbarment or suspension from practice of members or to discipline them by reproval, public or private, with such recommendation." (§ 6078.) "In those two areas, the bar's role has consistently been articulated as that of an administrative assistant to or adjunct of [the Supreme Court], which nonetheless retains its inherent judicial authority to disbar or suspend attorneys. In the area of admission to practice, an applicant is admitted only by order of the Supreme Court which, upon certification by the bar's examining committee that the applicant fulfills the admission requirements, 'may admit such applicant as an attorney at law in all the courts of this State. . . .'" (*Saleeby, supra,* at p. 557, citations omitted.) In addition to those duties, the State Bar enforces the law relating to the unlawful practice of law and illegal solicitation (§§ 6030, 6125-6131, 6150-6154), administers an arbitration system for fee disputes (§§ 6200-6206), maintains a client security fund (§ 6140.5) and engages in other similar matters relating to the legal profession.

In addition to these powers, the board is empowered to "aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice. . . ." (§ 6031, subd. (a).)[6] This has been called the "laudable general purpose of the [State Bar] act." (*Herron* v. *The State Bar* (1931) 212 Cal. 196, 199 [298 P. 474].) The bar's general counsel has described this provision as "the springboard for State Bar activities." (Hearing on Use of Mandatory State Bar Dues, Assem. Com. on Judiciary (Sept. 17, 1980) letter of Herbert M. Rosenthal, p. 111.) Some of the bar's actions undertaken pursuant to this section have been statutorily delineated; most have not. For example, the State Bar is mandated by statute to cooperate with and give assistance to the Commission on Judicial Performance (Gov. Code, § 68725), to assist the Law Revision Commission (Gov. Code, § 8287), and to evaluate the judicial qualifications of gubernatorial nominees for appointment to courts of record. (Gov. Code,

---

*Amendment Proscriptions on the Integrated Bar: Lathrop v. Donohue Re-Examined* (1980) 22 Ariz. L. Rev. 939, 941, fn. omitted.) It is to be distinguished from a voluntary bar association in which membership is optional with the lawyers of the state. (See Winters, Bar Association Organization and Activities (1954) p. 1.)

[6] The board is also authorized by that subdivision to aid in "all matters that may advance the professional interests of the members of the State Bar and such matters as concern the relations of the bar with the public."

§ 12011.5.) In aid of all of its powers, the State Bar is authorized to do all acts "necessary or expedient for the administration of its affairs and the attainment of its purposes." (§ 6001, subd. (g).)

To carry out its functions, the State Bar is governed by a Board of Governors of 22 members, 16 of whom are members of the State Bar and 6 of whom are nonattorneys appointed by the Governor of the state with approval of the Senate. (§§ 6010, 6011, 6013.5.) Fifteen of the attorney members of the board are elected by the members of the State Bar from geographical areas established by the Legislature, and one member is elected by the board of directors of the California Young Lawyers Association. (§§ 6012, 6013, 6013.4.) The board elects the officers of the State Bar. (§§ 6021-6024.) The State Bar has established a conference of delegates, which consists of representatives of voluntary local and special bar associations. The conference meets once a year to consider proposals, many of which are intended for legislative action. The board has also established committees or sections open to members of the bar interested in particular areas of the law and which advise the board in those areas.

The bar employs attorneys who represent it in disciplinary actions and other litigation, including the present case. On direction of the Board of Governors, the attorneys file briefs amicus curiae in litigation affecting the bar or its members. The bar also employs lobbyists to present the position of the board to the Legislature and state agencies.

III. *The State Bar, for the Purpose of Expenditure of Dues, Is Analogous to a Governmental Agency.*

The issue we face today came before the United States Supreme Court in *Lathrop* v. *Donohue* (1961) 367 U.S. 820 [6 L.Ed.2d 1191, 81 S.Ct. 1826]. Plaintiffs in that case challenged the constitutionality of the Wisconsin integrated bar. Relying on case upholding the constitutionality of legislation authorizing the union shop (*Machinists* v. *Street* (1961) 367 U.S. 740 [6 L.Ed.2d 1141, 1165, 81 S.Ct. 1784]; *Railway Employes' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714]), all justices agreed that compulsory membership in the bar was constitutional. (See *Levine* v. *Heffernan* (7th Cir. 1988) 864 F.2d 457.) Justice Brennan, writing for four justices, declined to reach questions concerning the use of mandatory dues because the plaintiffs had not objected to any specific expenditure. The remaining five justices agreed that the issue of use of dues was properly before the court, but disagreed on the result. Justice Harlan, joined by Justice Frankfurter, treated the bar association as analogous to a governmental agency and dues as analogous to license fees, and found no constitutional infirmity in the use of dues for authorized purposes. (See *Lathrop,*

*supra,* 367 U.S. at pp. 864-865 [6 L.Ed.2d at pp. 1217-1218].) The member, he points out, is not required affirmatively to profess or assent to any belief, and the bar, in its lobbying activities, did not claim to present the views of all of its members. (See *id.* at pp. 860-861 [6 L.Ed.2d at p. 1215].) Justice Whittaker asserted briefly that practicing law was a special privilege, which could be conditioned on payment of bar dues. Justices Douglas and Black dissented, referring to their opinions in *Machinists* v. *Street, supra,* 367 U.S. 740, where they said that the use of union dues to finance political activities violated the members' First Amendment rights. Thus as pointed out in a subsequent case, all *Lathrop* decided was that the constitutional issues concerning use of bar dues should be decided; it did not decide those issues. (*Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209, 233, fn. 29 [52 L.Ed.2d 261, 233, 97 S.Ct. 1782].)

Consequently the treatment of bar dues remains an unsettled question. We recognize certain similarities between the bar and a labor union which would support imposing upon the bar those restrictions which limit union expenditures. The bar is an association composed of members of a particular profession. It is governed by a board, the majority of whom are elected by the members. It holds annual meetings. Although much of its activity is done to promote the public interest, it also regularly acts on behalf of the special interest of its members.

The California Constitution, statutes, and judicial decisions, however, appear to envision the bar as a governmental agency. The State Bar Act of 1927, codified in sections 6000-6087, provides in section 6001 that "[t]he State Bar of California is a public corporation." This declaration attained constitutional status with the enactment in 1966 of article VI, section 9 of the state Constitution, which asserts that "[t]he State Bar of California is a public corporation. Every person admitted and licensed to practice law in this State is and shall be a member of the State Bar except while holding office as a judge of a court of record."

■ What is a "public corporation"? When the State Bar Act was enacted in 1927, this term was defined by a statute, since repealed: a public corporation is one "formed or organized for the government of a portion of the state." (Former Civ. Code, § 284.) Construing that statute, a 1917 decision said that "[p]ublic corporations . . . are those corporations formed for political and governmental purposes and vested with political and governmental powers." (*Bettencourt* v. *Industrial Acc. Com.* (1917) 175 Cal. 559, 561 [166 P. 323].)

In *State Bar of California* v. *Superior Court* (1929) 207 Cal. 323 [278 P. 432], it was contended that the State Bar could not be a public corporation

because it was not created to govern "a portion of the state," and that the State Bar Act was thus an unconstitutional attempt to create a private corporation.[7] The court responded that the statute defining a public corporation could not limit the Legislature from enacting subsequent statutes creating public corporations for purposes other than the government of a portion of the state. It added that the Legislature has frequently created public corporations which did not have the function of governing a portion of the state, citing examples of reclamation districts, levee districts, and irrigation districts.[8]

It was further argued in *State Bar of California* v. *Superior Court, supra,* 207 Cal. 323 that the State Bar must be considered a private corporation in view of its membership, functions, purpose, and its independence from public regulation and control. The court responded that the regulation of the practice of law is within the police power of the state—a close issue in 1929, but not today—and referred to legislative and judicial regulation as sufficient to classify the bar as a public corporation.

█ This decision does not answer the question whether a public corporation is necessarily a governmental agency. But it is significant that all other public corporations in California—water districts, school districts, reclamation districts, etc.—are clearly considered governmental entities. Conversely, no labor union or professional association is classified as a public corporation.

Apart from its denomination as a public corporation, other aspects of the bar show its governmental nature. The Board of Governors includes six public members appointed by the Governor, who are not members of the bar. (§ 6013.5.) The presence of "consumer representatives" on state regulatory boards is a common phenomenon, but no law permits the Governor to appoint nonmembers as officers of a labor union or private association. Section 6008 declares that "[a]ll property of the State Bar is hereby declared to be held for essential public and governmental purposes" and is exempt from taxation. Section 6026.5 requires public meetings; a similar requirement applies to governmental regulatory boards but not to unions or private

---

[7] The parties and the court appeared to assume that "a portion of the state" meant a geographical portion. One amicus curiae in the present case, however, contends that "portion" can be defined in other ways, and that the State Bar does govern a portion of the state, namely the attorneys of California in the practice of their profession.

[8] These are districts which perform services for landowners within a geographic area. Although their structures vary (many having been created by special statute), generally they are governed by an elected board. The electors may consist of all residents, or of landowners, and the latter may vote in proportion to the value of their holdings. Such districts generally have the power to levy taxes.

School districts represent another type of nonmunicipal public corporation.

associations. Section 6001, subdivision (g) states that "[n]o law of this State restricting, or prescribing a mode of procedure for the exercise of powers of state public bodies or state agencies . . . shall be applicable to the State Bar, unless the Legislature expressly so declares"—an unnecessary enactment unless laws governing the exercise of powers of state public bodies or state agencies would otherwise apply to the bar. In *Chronicle Pub. Co.* v. *Superior Court* (1960) 54 Cal.2d 548 [7 Cal.Rptr. 109, 354 P.2d 637] we said that this last provision demonstrates "[t]hat the Legislature considered the State Bar as at least akin to a state public body or agency" (p. 565), and held that officers of the bar could claim the confidential communication privilege given public officers under former Code of Civil Procedure section 1881.[9] A later decision, *Engel* v. *McClosky* (1979) 92 Cal.App.3d 870 [155 Cal.Rptr. 284], applied the tort claims act (Gov. Code, § 810 et seq.) to the State Bar.[10]

A recent amendment to section 6031 further indicates that the Legislature views the bar as a governmental agency. Subdivision (b), added by the amendment, provides that "the board [of governors] shall not conduct or participate in, or authorize any committee, agency, employee, or commission of the State Bar to conduct or participate in any evaluation, review, or report on the qualifications, integrity, diligence, or judicial ability of any specific justice [of an appellate court] . . . without prior review and statutory authorization by the Legislature." If the State Bar is considered a private association, the constitutionality of this statute is suspect. It is a content-defined prohibition of a particular form of political speech by a named organization, imposed, apparently, because the Legislature objected to bar attempts to influence the voters. It would be difficult to justify a prohibition on political speech by a private association, especially one enacted because the speaker is thought too knowledgeable and influential with the voters. If the bar is thought of as a governmental agency, on the other hand, section 6031, subdivision (b), merely defines the scope of authority of the agency, and raises no constitutional question.

 As we noted earlier, the Court of Appeal divided the State Bar's function into two parts. It held that in regulating the admission of members to the bar, and disciplining current members, the bar performed a govern-

---

[9] Former Code of Civil Procedure section 1881, subdivision 5, provided that "[a] public officer cannot be examined as to communications made to him in official confidence, when the public interest would suffer by the disclosure." This statute has been superseded by Evidence Code sections 1040-1042.

[10] The tort claims act applies to "public entities," defined as including "the State, the Regents of the University of California, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the State." The Law Revision Commission Comment states that "[t]his definition is intended to include every kind of independent political or governmental entity in the state."

mental function, but in all other activities it was analogous to a private association. We reject this holding on two grounds. The first is simply that the reason we view the bar as analogous to a governmental agency is not only that it performs a governmental function, but that the state Constitution, statutes, and court decisions treat it as a governmental agency. Those enactments and decisions do not differentiate according to the specific activity performed by the bar. Thus the bar is a public corporation, whether it is disciplining members or filing amicus curiae briefs; it is exempt from taxation and immune from tort liability both when examining applicants for admission and when lobbying the Legislature. Its stature under the California Constitution, its structure, and its government are the same for all its functions. We conclude that however classified, it must be regarded as a single entity.

Second, the Court of Appeal's dichotomy, viewing lobbying and amicus curiae activity as that of a private association, would frustrate the legislative purpose underlying the bar's authority to promote the administration of justice. Under the Court of Appeal's view, whenever the bar proposed to advise the Legislature or the courts of its views on a matter, it would first have to engage in the three-step analysis set out in *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883]. The bar must first determine whether the activity is germane to the purpose for which the bar has compulsory membership. Next, if the activity is germane, it must decide whether it inflicts an infringement of the dissenters' First Amendment rights beyond that inflicted by compulsory membership alone. Finally, if there is an infringement of First Amendment rights, it must determine whether there is a state interest sufficient to justify that infringement.[11]

Such a procedure would be an extraordinary burden. Hundreds of bills come before each legislative session; cases affecting the administration of

---

[11] Serious conceptual difficulties arise in applying this three-step analysis to the State Bar. The first step asks whether an activity is germane to the purpose of compulsory membership. We know the functions of the State Bar—they are set out in statute—but the concurring and dissenting opinion impliedly suggests that the purpose of compulsory membership may be a more limited one, the delivery of quality legal services and the improvement of the legal profession. (*Post*, pp. 1185-1186.) It does not explain this distinction.

The second step inquires whether the activity imposes a burden on First Amendment rights additional to that imposed by compulsory membership. The cases, however, do not elucidate which uses of dues impose burdens subsumed in compulsory membership, and which impose additional burdens.

The last step examines whether there is a state interest sufficient to justify the additional burden on objectors' rights. We have no guidance on what interest will meet this criterion: the Michigan Supreme Court, which considered this matter twice, was unable to reach agreement. (*Falk* v. *State Bar of Michigan* (1981) 411 Mich. 63 [305 N.W.2d 201] [*Falk I*]; *Falk* v. *State Bar of Michigan* (1983) 418 Mich. 270 [342 N.W.2d 504] [*Falk II*], cert. denied (1984) 469 U.S. 925 [83 L.Ed.2d 253, 105 S.Ct. 315].)

justice arise frequently. Bar action, to be effective, must take place before the legislative session ends or the case is submitted. ▮▮▮ ▮▮ The bar has neither time nor money to undertake a bill-by-bill, case-by-case *Ellis* analysis, nor can it accept the risk of litigation every time it decides to lobby a bill or brief a case.[12] Thus the likely result of the Court of Appeal's approach would be to deter the bar from conducting *any* lobbying or filing *any* amicus curiae briefs. If those activities promote the administration of justice by providing the Legislature and the courts with expert legal assistance, as we believe, an approach which would deter all lobbying and amicus curiae activity would frustrate the state interest underlying the establishment of an integrated bar.

▮▮ Furthermore, the one area where the Legislature has indicated displeasure with the bar's activity concerns election campaigning. Yet if the bar is viewed as a private association, it would have a constitutional right to participate fully in political campaigns. (See *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 235-236 [52 L.Ed.2d 261, 284-285]; cf. *Buckley* v. *Valeo* (1976) 424 U.S. 1 [46 L.Ed.2d 659, 96 S.Ct. 612].) No explicit authorization would be necessary; any prohibition on such activity, such as section 6031, subdivision (b), would be unconstitutional.[13] Again, such a result would seem inconsistent with legislative intent.

We recognize that most of the cases from other jurisdictions which have addressed the subject of integrated bar dues have applied the labor union analogy to the bar. (*Gibson* v. *The Florida Bar* (11th Cir. 1986) 798 F.2d 1564; *Schneider* v. *Colegio de Abogados de Puerto Rico* (D.P.R. 1983) 565 F.Supp. 963, revd. in part in *Romany* v. *Cologio de Abogados de P.R.* (1st Cir. 1984) 742 F.2d 32, on remand *Schneider* v. *Colegio de Abogados de Puerto Rico* (D.P.R. 1988) 682 F.Supp. 674; *Arrow* v. *Dow* (D.N.M. 1982) 544 F.Supp. 458 [N.M. Bar]; *The Florida Bar* v. *Kennedy* (Fla. 1983) 439 So.2d 213; *Falk I, supra,* 305 N.W.2d 201; *Falk II, supra,* 342 N.W.2d 504; *Reynolds* v. *State Bar of Montana* (Mont. 1983) 660 P.2d 581 [40 A.L.R.4th 669].)[14] None of the bar associations involved in those cases, however, rest

---

[12] The situation is not analogous to a labor union, which serves a much more limited function and constituency. The function of the bar is not limited to promoting the self-interest of its members, but extends to promoting the improved administration of justice. Thus the bar is properly concerned with legislation other than just that which affect the earnings and working conditions of attorneys.

[13] The bar as a private association would be subject to limitations on what election activities it could finance from dues. (Cf. *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435.) But actions which do not require expenditure of money, such as the endorsement of candidates, could not be challenged.

[14] The one exception is *Sams* v. *Olah* (1969) 225 Ga. 497 [169 S.E.2d 790]. The Georgia Supreme Court rejected a contention that the integrated bar of Georgia was unconstitutional because it spent funds for political purposes. Declaring that the bar was not a labor union (p. 506), the court concluded that the only issue was whether the fees were spent for the

upon a constitutional and statutory structure comparable to that of the California State Bar. None involves an extensive degree of legislative involvement and regulation. Consequently, while we are uncertain whether the courts have correctly described the bar associations at issue in the cited cases[15] we remain confident that the California State Bar is best described as analogous to a governmental agency.[16]

## IV. *The Consequences of Viewing the State Bar as a Governmental Agency.*

■ If the bar is considered a governmental agency, then the distinction between revenue derived from mandatory dues and revenue from other sources is immaterial. A governmental agency may use unrestricted revenue, whether derived from taxes, dues, fees, tolls, tuition, donation, or other sources, for any purposes within its authority.

---

purposes for which the bar was created. (P. 507.) "The promotion of political issues and candidates is not within the purposes of the State Bar. . . . The fostering of legislation and the promotion of ideologies may, or may not, be consonant with the purposes of the State Bar, according to the nature of the legislation and the ideologies." (P. 508.)

[15] Only one of these cases gives any reason for applying the labor union paradigm to an integrated bar instead of viewing it as a governmental agency. *Gibson* v. *The Florida Bar, supra,* 798 F.2d 1564, 1568, quoted Justice Powell's concurring opinion in *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 259, footnote 13 [52 L.Ed.2d 261, 299], where he said that " 'the reason for permitting the government to compel the payment of taxes and to spend money on controversial projects is that the government is representative of the people. The same cannot be said of a union, which is representative only of one segment of the population, with certain common interests. The withholding of financial support is fully protected as speech in this context.' " (798 F.2d at p. 1568, quoting *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, 259, fn. 13 [52 L.Ed.2d 261, 299].)

We find the argument unpersuasive. A city government is representative of a segment of the state's population which, by reason of geography, shares common interests; a bar association is representative of a segment which, by reason of career, shares common interests. Each, we think, is a governmental agency, which to fulfill its statutory function must be able to spend money on controversial matters.

[16] In *Lathrop* v. *Donohue, supra,* 367 U.S. 820, 864-865 [6 L.Ed.2d 1191, 1217-1218], Justice Harlan, supporting the use of dues to finance lobbying by the Wisconsin bar, wrote: "I had supposed it beyond doubt that a state legislature could set up a staff or commission to recommend changes in the more or less technical areas of the law into which no well-advised laymen would venture without the assistance of counsel. . . . It seems no less clear to me that a reasonable license tax can be imposed on the profession of being a lawyer. . . . In this circumstance, wherein lies the unconstitutionality of what Wisconsin has done? Does the Constitution forbid the payment of some part of the Constitutional license fee directly to the equally Constitutional state law revision commission? Or is it that such a commission cannot be chosen by a majority vote of all members of the state bar? Or could it be that the Federal Constitution requires a separation of state powers according to which a state legislature can tax and set up commissions but a state judiciary cannot do these things? [¶] I end as I began. It is exceedingly regrettable that such specious contentions . . . should have resulted in putting the Integrated Bar under this cloud of partial unconstitutionality."

Two Court of Appeal decisions illustrate the point. In *Erzinger* v. *Regents of University of California* (1982) 137 Cal.App.3d 389 [187 Cal.Rptr. 164], certiorari denied, 462 U.S. 1133 [77 L.Ed.2d 1368, 103 S.Ct. 3113], students at the University of California objected that the compulsory student registration fees included a fee for health services which included abortions. The Court of Appeal, noting that the Board of Regents is a governmental agency, treated the fee as equivalent to a tax, and held that one could not refuse to pay a tax because of ideological or religious objections to the use of the money.

In *Miller* v. *California Com. on Status of Women* (1984) 151 Cal.App.3d 693 [198 Cal.Rptr. 877], appeal dismissed, 469 U.S. 806 [83 L.Ed.2d 15, 105 S.Ct. 64], plaintiffs attacked the commission's expenditures incurred in lobbying for the enactment of the equal rights amendment. The Legislature responded by enacting Government Code section 8246, which expressly authorized such lobbying.[17] The Court of Appeal found the statute controlling. ██ Rejecting the claim that commission lobbying infringed the rights of dissenters, it wrote that the claim failed to distinguish between the government's addition of its own voice and its silencing of others. " 'That government must regulate expressive activity with an even hand if it regulates such activity at all does not mean that government must be ideologically "neutral." ' " (P. 700, quoting Tribe, American Constitutional Law (1978) p. 588.) Government may not compel citizens to express a particular viewpoint, nor delegate to nongovernmental entities the power to extract funds to support political and ideological activity not directly related to the entity's purpose. (*Ibid.*, citing *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209.) " 'But none of this means that government cannot add its own voice to the many that it must tolerate, provided it does not drown out private communication.' " (*Ibid.*, quoting Tribe, *op. cit. supra,* p. 590.) "If the government . . . cannot appoint a commission to speak on the topic [of the status of women] without implicating plaintiffs' First Amendment rights it may not address any other 'controversial' topics. If the government cannot address controversial topics it cannot govern." (P. 701.)[18]

██ We conclude that the State Bar, considered as a government agency, may use dues for any purpose within the scope of its statutory authority. The concurring and dissenting opinion disputes this conclusion, arguing

---

[17] Section 8246 provides in subdivision (a) that "[t]he commission is expressly authorized to inform the Legislature of its position on any legislative proposal pending before the Legislature and to urge the introduction of legislative proposals."

[18] Other cases approving lobbying by governmental agencies include *Stanson* v. *Mott* (1976) 17 Cal.3d 206, 218 [130 Cal.Rptr. 697, 551 P.2d 1]; *Crawford* v. *Imperial Irrigation Dist.* (1927) 200 Cal. 318 [253 P. 726]; *Powell* v. *City & County of S.F.* (1944) 62 Cal.App.2d 291 [144 P.2d 617].

that even if the bar is a governmental agency its use of dues should be subject to restrictions hitherto imposed only on labor unions and other private associations. But no precedent supports the imposition of such restrictions on a governmental agency. Moreover, as we have previously explained (*ante,* pp. 1165-1166), applying the labor union test to the bar would impose upon the bar the massive burden of analyzing all proposed activities under vague and uncertain standards designed for organizations of quite different purpose and structure, and would probably discourage the bar from carrying out its statutory functions.[19]

 Having decided that the bar may use dues for any authorized purpose, we next inquire into the scope of its authority. As previously noted, section 6031, subdivision (a) authorizes the bar to "aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice." In the context of lobbying and amicus curiae activities, this language should be read broadly. Laws are the business of lawyers. The drafting of a proposed law, the understanding of the relationship between that law and existing legislation, and the appreciation of the practical impact of the proposed legislation are matters which often require expert legal knowledge and judgment. Whatever the subject of the proposed law, it is likely that among the members of the State Bar are some with the needed expertise, whose collective advice can lead to significant improvements in the legislative proposal. "The state has a valid interest in drawing upon [lawyers'] training and experience in order to promote improvements in the administration of justice and to advance jurisprudence. The better attuned the legal machinery is to the public's needs of health, safety, and welfare, the better the state will be able to perform its job of protecting and serving the public. The input and feedback on proposed legislation and court rules is invaluable to the state in fine-tuning its legislative and judicial systems." (*Falk I, supra,* 305 N.W. 201, 231-232 (opn. of Williams, J.) fns. omitted.)[20]

Thus we do not distinguish between proposed legislation of substantive character and that which aims only at procedural changes. Substantive legislation has procedural effects, as, for example, when a change in tort law affects the number of cases settled and the number going to trial. And even if the proposed bill seems at first glance to relate entirely to substantive

---

[19] Under the concurring and dissenting opinion, the State Bar would have the worst of both the private and the governmental worlds. It would be subject to constitutional restrictions on its use of dues, as are private associations, but would not enjoy the constitutional rights of private associations to endorse candidates and engage in political campaigns.

[20] The same reasoning applies to lobbying before administrative agencies, and to the filing of amicus curiae briefs. Agencies and courts, in their interpretation of laws, also benefit from the collective advice of the bar.

matters unrelated to the practice of law, the advice of expert practitioners could still be crucial; an example might be a bill concerning community property which has consequences, unforeseen by its author, upon estate planning or federal tax liability.

We conclude that a bill-by-bill, case-by-case, review of bar lobbying and amicus curiae briefs is unnecessary and unworkable. We do not impose such scrutiny on lobbying and litigating by other governmental agencies. The Legislature is well aware of the bar's activities, and that the bar's authority for those activities derives from section 6031. Knowing these matters, the Legislature has annually approved bar dues, some of which go to support lobbying and amicus curiae briefs, and has amended section 6031 to prohibit one specific activity—the rating of appellate judges. We infer that the Legislature essentially approves a broad construction of the statute which would permit the bar's existing activities.

■ Holding a conference of delegates also falls within the bar's authority. (Cf. *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435, 448, 455-456 [80 L.Ed.2d 428, 446-447] (union conventions).) Plaintiffs, however, assert that some of the resolutions debated and passed by the conference fall beyond the boundary. The examples they cite, however, do not support this assertion; all but one relate to proposed changes in California law and that one relates to federal court jurisdiction, a subject which affects the practice of law in California.

■ The bar's actions in connection with the 1982 election present a different issue. We have no doubt that the bar's actions related to the administration of justice. Indeed few matters bear as directly upon the administration of justice as the standards for the appointment and retention of judges. In *Stanson* v. *Mott, supra,* 17 Cal.3d 206, however, we set out a special rule limiting state agency participation in election campaigns. We there stated that absent "clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign." (17 Cal.3d at pp. 209-210.) Informational or education expenditures, on the other hand, require no such explicit authorization, for an agency has "implicit power to make 'reasonable expenditures for the purpose of giving voters relevant facts to aid them in reaching an informed judgment. . . .'" (P. 220, quoting *Citizens to Protect Pub. Funds* v. *Board of Education* (1953) 13 N.J. 172 [98 A.2d 673, 676].)

We recognized that "[f]requently . . . the line between unauthorized campaign expenditures and authorized informational activities is not so clear. . . . In such cases, the determination of the propriety or impropriety of the expenditure depends upon a careful consideration of such factors as

the style, tenor and timing of the publication; no hard and fast rule governs every case." (17 Cal.3d at p. 222, fn. omitted.)

The present case is one of those we anticipated in *Stanson v. Mott, supra,* 17 Cal.3d 206. Anthony Murray's inaugural speech was delivered about three months before the 1982 election, and clearly referred to that election. (The speech itself, of course, cost the State Bar nothing; the issue concerns its being publicized through press release and educational materials.) Some of its language is quite strident; he denounces the "idiotic cries of . . . self-appointed vigilantes . . . [and] unscrupulous politicians." Some portions of the speech are restrained and educational in tone: he describes the history of the concept of judicial independence from the failed impeachment of Justice Samuel Chase to the present day and the role and philosophy of the bar,[21] and presents statistics concerning this court's review of criminal cases. The speech did not mention any justice by name, or urge the retention of any or all of the justices.[22] The bar's subsequent press release simply describes the speech, highlighting Murray's assertion that "the only legitimate basis for refusing to retain or for recalling a justice is a showing of incapacity or misconduct in office."

The educational packet, sent to local bar associations and other interested groups, contained Murray's speech, a sample speech entitled "The Case for an Independent Judiciary" (a quite restrained and philosophical exposi-

---

[21] Murray asserts a proposition which counsel for the State Bar have not chosen to argue here—that it is the proper role and indeed duty of the bar to defend the judiciary from unjustified attack because judges are inhibited from election campaigning themselves. Amici curiae adopt the argument and refer us to the American Bar Association Code of Professional Responsibility, Ethical Consideration, EC 8-6, which states that "[a]djudicatory officials, not being wholly free to defend themselves, are entitled to receive the support of the bar against unjust criticism."

[22] As *Stanson, supra,* 17 Cal.3d 206, explains, it is not essential that the publication expressly exhort the voters to vote one way or another. *Stansson* notes: "In 35 Ops.Cal.Atty.Gen. 112 (1960), for example, the trustees of the Madera Union High School District placed a full page advertisement in a general circulation newspaper one day before a school bond election. The advertisement did not explicitly urge voters to 'Vote Yes' on the bond issue, but stated in large letters that 'A CLASSROOM EMERGENCY EXISTS NOW AT MADERA UNION HIGH SCHOOL' and listed a number of reasons why additional funds were needed by the school district. The county counsel requested the Attorney General's opinion as to whether public funds could be used to pay for the advertisement.

"After reviewing the relevant judicial authorities, the Attorney General concluded that although the advertisement did not explicitly urge a 'Yes' vote and did disclose relevant factual information, the use of public funds to pay for the advertisement would nonetheless be improper. The opinion reasoned: 'Viewed as a whole, the advertisement cannot properly be held to be a publication primarily designed to educate the voters as to the activities carried on by or the conditions of the schools of the district. . . . The style, tenor and timing of the advertisement placed by the board of trustees points plainly to the conclusion that the publication was designed primarily for the purpose of influencing the voters at the forthcoming school bond election.' (35 Ops. Cal.Atty.Gen. 112, 114.)" (17 Cal.3d at p. 222, fn. 8.)

tion), sample letters to organizations which might provide a speech forum, and a sample press release. It also included fact sheets on crime and conviction rates, judicial selection and retention, and judicial performance and removal criteria. It concluded with quotations concerning judicial independence from Hamilton, Madison, Jefferson, and others.[23]

, The bar may properly act to promote the independence of the judiciary; such conduct falls clearly within its statutory charge to advance the science of jurisprudence and improve the administration of justice. In the present case, however, the nature and timing of the 1982 publication (see *Stanson* v. *Mott, supra,* 17 Cal.3d 206, 222), indicate that it is a form of prohibited election campaigning. The material was distributed approximately one month before an election in which six justices of this court came before the voters for confirmation. It is the kind of material which a state election committee distributes to local committees to aid them in the campaign. Its style and tenor is appropriate to that end; it is basically informative and factual, but without claim of impartiality, and includes such practical tools as a form letter to groups which might host a speaker. While intended to educate the reader because its authors believed an informed campaigner would be a more effective campaigner, its primary purpose, we believe, was to assist in the election campaign on behalf of the justices. We conclude that in preparing and distributing this material, the State Bar exceeded its statutory authority.

 In view of the absence of any prior authority in California construing section 6031, and the obvious difficulty of the issue, we cannot fairly hold the governors personally liable for the 1982 expenditures. The bar has long been concerned with promoting and defending the independence of the judiciary. It formally endorsed the initiative which established the present system of judicial retention elections in place of partisan elections.[24] It has frequently debated and proposed measures for merit selection and life tenure for judges. As we noted earlier, it is charged with an ethical obligation to defend the judiciary from unfair attack. (See fn. 21, *ante.*) Under these circumstances, we conclude as a matter of law that the Board of Governors

[23] In distributing these materials, the bar acted pursuant to a unanimous resolution of the Board of Governors declaring "that it is the duty of the legal profession and all of its members to . . . [t]ake steps to maintain and promote understanding and confidence, among the citizens of this state and the nation, in the need for an independent judiciary. . . ." The resolution further declared "that the State Bar should take necessary and appropriate steps to support these principles and to aid the profession and the public in understanding them."

[24] The present system was an outgrowth of an earlier proposal for reform of judicial elections in Los Angeles County. That proposal was drafted by the bar, which lobbied for passage of the constitutional amendment through the Legislature and then campaigned unsuccessfully for its approval by the voters. (See Smith, *The California Method of Selecting Judges* (1951) 3 Stan.L.Rev. 571.)

could reasonably believe that it had the authority to take action in opposition to what it perceived to be an attack on an independent judiciary. Under *Stanson* v. *Mott, supra,* 17 Cal.3d 206, 226-227, such a reasonable belief precludes personal liability.

## V. *Conclusion.*

■ In light of the structure of the California State Bar, as imposed in the state Constitution, statutes, and court decisions, we conclude that the activities of the bar should be governed by the standards applicable to governmental agencies. Thus lobbying, amicus curiae briefs, and the annual conference of delegates can be financed through dues as presently done. The bar, however, may not engage in election campaigning; its activities in publicizing Murray's 1982 speech and distributing the educational packet violated that prohibition. In light of past uncertainty concerning the scope of the bar's authority, however, we hold that the governors are not personally liable for the unauthorized expenditures.

The judgment of the Court of Appeal is reversed, and the case remanded for further proceedings consistent with this opinion.

Mosk, J., Arguelles, J., and White (Clinton W.), J.,* concurred.

KAUFMAN, J.—I concur in the majority's conclusions that the State Bar is precluded from engaging in election campaigning and that the bar's publication of President-elect Anthony Murray's 1982 speech and distribution of the educational package violated that prohibition. I further concur in the majority's holding that the bar governors are not personally liable for reimbursement of the unauthorized electioneering expenditures. I respectfully dissent, however, from its holding that, because of the State Bar's status as a governmental agency, its expenditure of objecting members' mandatory dues for political or ideological causes is lawful and exempt from constitutional scrutiny.

### DISCUSSION

The majority opinion considers the California State Bar to be "best described as analogous to a governmental agency." If viewed as a governmental agency, the majority declares, the bar is not subject to First Amendment constraints when spending its objecting members' mandatory dues because a governmental agency may expend tax revenues to perform its statutory duties without restrictions and "the distinction between revenue derived

---

* Presiding Justice, Court of Appeal, First Appellate District, Division Three, assigned by the Chairperson of the Judicial Council.

from mandatory dues and revenue from other sources is immaterial." (Maj. opn. at p. 1167.) Therefore, the majority concludes, the bar may properly spend funds for "all matters pertaining to the advancement of the administration of justice," (Bus. & Prof. Code, § 6031, subd. (a)), which it defines expansively as virtually anything having to do with law, except electioneering.

While it correctly characterizes the State Bar as a governmental agency, the majority opinion is incorrect in concluding that because the State Bar is a governmental agency its expenditure of objecting members' dues is exempt from First Amendment scrutiny. That error is grounded in the majority's failure to recognize the significance of a crucial fact: The California State Bar derives its funds from membership dues which all attorneys, and only attorneys, in California are required by law to pay as a condition precedent to pursuing their livelihood—the practice of law—in the state. It is this fact—compelled membership in a professional association with mandatory dues as a condition to practice the profession of law—that subjects the State Bar to the constitutional scrutiny from which most other governmental agencies may be exempt. In an unbroken line of cases, the United States Supreme Court has held that, when a state compels membership in an association as a condition precedent to earning a livelihood, the association's objecting members' First Amendment rights are infringed by its expenditure of mandatory membership dues for philosophical, political or ideological causes.

Resistance to coerced association and intolerance of government-enforced support of philosophical, religious, political or ideological causes animated the founding of our nation and the drafting of its Constitution. Thomas Jefferson wrote in 1779 "that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves is sinful and tyrannical." (Brant, James Madison: The Nationalist (1948) p. 354.) Madison warned that "the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases . . . ." (II Writings of James Madison (Hunt ed. 1901) p. 186.)

These principles have guided the United States Supreme Court's First Amendment jurisprudence. "If an association is compelled, the individual should not . . . be required to finance the promotion of causes with which he disagrees." (*Machinists* v. *Street* (1961) 367 U.S. 740, 776 [6 L.Ed.2d 1141, 1165, 81 S.Ct. 1784] [Douglas, J., conc.].) "[T]he First Amendment, fairly construed, deprives the Government of all power to make any person pay out one single penny against his will to be used in any way to advocate doctrines or views he is against, whether economic, scientific, political,

religious or any other." (*Id.* at p. 791 [6 L.Ed.2d at p. 1174] [Black, J., dis.].) First Amendment principles "prohibit the [state] from requiring any [individual] to contribute to the support of an ideological cause he may oppose as a condition of holding a job . . . ." (*Abood* v. *Detroit Board of Education* (1977) 431 U.S. 209, 235 [52 L.Ed.2d 261, 284, 441, 97 S.Ct. 1782].) Individuals can "be required to become 'members' of [an association], but those who object[] [can]not be burdened with any part of the [association's] expenditures in support of political or ideological causes." (*Ellis* v. *Railway Clerks* (1984) 466 U.S. 435, 447 [80 L.Ed.2d 428, 104 S.Ct. 1883].) "The amount at stake for each individual dissenter does not diminish this concern. For, whatever the amount, the quality of [the dissenters'] interest in not being compelled to subsidize the propagation of political or ideological views that they oppose is clear." (*Teachers* v. *Hudson* (1986) 475 U.S. 292, 305 [89 L.Ed.2d 232, 246, 106 S.Ct. 1066, 1075].) Indeed, *Hudson* emphasized this point by relying on the principles expressed by Thomas Jefferson and James Madison quoted above. (*Id.* at p. 305, fn. 15 [89 L.Ed.2d at p. 246, 106 S.Ct. at p. 1075]; see also *Abood* at pp. 234-235, fn. 31 [52 L.Ed.2d at p. 284]; *Street* at p. 778, fn. 4 [6 L.Ed.2d at p. 1166] [Douglas, J., conc.].)

The United States Supreme Court has thus steadfastly invalidated coerced association to the extent it enforces financial support of political and ideological causes to which a member objects. In a series of decisions, the court has prohibited unions from expending the mandatory dues of objecting members for such causes not sufficiently related to the governmental interests justifying coerced association. (*Ellis, supra,* 466 U.S. at p. 447 [80 L.Ed.2d at p. 441].) As I explain below, these same First Amendment principles also preclude the California State Bar from spending its objecting members' mandatory dues for controversial causes not sufficiently related to the governmental interests that justify compulsory bar membership.

In this connection it is essential to keep in mind that except as to expenditures for electioneering, the principal question in this case is not whether the State Bar may lawfully make the expenditures at issue, but whether in doing so it may utilize the compulsory dues of objecting members and thereby compel those members to support causes they oppose. Simply concluding, as the majority does, that the State Bar is authorized to make the expenditures to which plaintiffs object does not resolve the constitutional question of whether plaintiffs' First Amendment rights are infringed by the expenditure of their compulsory dues for political and ideological activities to which they object.

I. *Expenditure of Dues for Political and Ideological Activities Violates the First Amendment*

A. *Historical Origins*

In *Railway Employes' Dept.* v. *Hanson* (1956) 351 U.S. 225 [100 L.Ed. 1112, 76 S.Ct. 714], the United States Supreme Court first considered a challenge to a "union shop" agreement.[1] Nonunion employees complained that such an agreement, by forcing them "into ideological and political associations which violate their right to freedom of conscience, freedom of association, and freedom of thought," violated their First Amendment rights. (*Id.* at p. 236 [100 L.Ed.2d at p. 1132].) Because the challenge was directed to the facial validity of the Railway Labor Act, the court confined its inquiry to the statute, holding that Congress, acting under its broad commerce clause powers,[2] could reasonably determine that industrial peace required all employees who benefitted from union representation to support financially "the work of the union in the realm of collective bargaining." (*Id.* at p. 235 [100 L.Ed.2d at p. 1132].) The court specifically noted, however, that First Amendment problems would arise if " 'assessments' are in fact imposed for purposes not germane to collective bargaining." (*Ibid.*) Thus, the court indicated the possibility of a First Amendment challenge in situations where a union, under a union shop agreement, required objecting employees to support financially activities not germane to the union's collective bargaining duties. (See *id.* at p. 238 [100 L.Ed.2d at p. 1134].)

Just such a challenge was presented in *Machinists* v. *Street, supra,* 367 U.S. 740, 749 [6 L.Ed.2d 1141, 1150]. In *Street,* the plaintiff alleged that the union, which required him to pay dues under a union shop agreement, used these funds "to finance the campaigns of candidates for federal and state offices whom he opposed, and to promote the propagation of political and economic doctrines, concepts and ideologies with which he disagreed." (367 U.S. at p. 744 [6 L.Ed.2d at p. 1147].) The court chose, however, to avoid the constitutional question, basing its decision instead on an interpretation of the relevant statute. It held that Congress, in enacting the union shop provision (§ 2, Eleventh, of the Railway Labor Act), never intended to grant the authority to a union, over the employee's objection, to spend his money for political causes which he opposes. (*Id.* at p. 768 [6 L.Ed.2d at pp. 1160-1161].)

---

[1] A union shop agreement is a provision in a collectively bargained agreement which requires employees, within a certain period of time after being hired, to join and maintain membership in the union. (See § 2, Eleventh, of the Railway Labor Act, 45 U.S.C. § 152, Eleventh.)

[2] The court noted that the commerce clause power "often has the quality of police regulations." (*Hanson, supra,* 351 U.S. at p. 235 [100 L.Ed.2d at p. 1132].)

B. *The Court's Consideration of Integrated Bar Associations*

In a companion case to *Street, supra,* 367 U.S. 740 (*Lathrop v. Donohue* (1960) 367 U.S. 820 [6 L.Ed.2d 1191, 81 S.Ct. 1826]), the United States Supreme Court considered a challenge by members of the Wisconsin State Bar to an order of the Wisconsin Supreme Court requiring all attorneys to become bar members. The plaintiff, a Wisconsin attorney, had paid his dues under protest and sued for a refund, claiming that the state bar used his dues to engage in political activities which he opposed and that, by coercing him to join the bar and support its political activities, the Wisconsin Supreme Court order integrating the state bar was unconstitutional.

The United States Supreme Court concluded that by integrating the bar the Wisconsin Legislature and Supreme Court had advanced the public interest " 'by maintaining high standards of conduct in the legal profession and by aiding in the efficient administration of justice' " (*Lathrop, supra,* at pp. 831-832 [6 L.Ed.2d at p. 1199]). Relying on its analysis in *Hanson, supra,* 351 U.S. 225, the court stated that "the Supreme Court of Wisconsin, in order to further the State's legitimate interests in raising the quality of professional services, may constitutionally require that the costs of improving the profession in this fashion should be shared by the subjects and beneficiaries of the regulatory program, the lawyers, even though the organization created to attain the objective also engages in some legislative activity." (*Lathrop* at p. 843 [6 L.Ed.2d at p. 1205].) Several points underlying this holding have particular significance to the instant case.

First, it is significant that the court considered the *regulatory* function of the Wisconsin State Bar to be the primary justification for the compulsory membership requirement. (See Schneyer, *The Incoherence of the Unified Bar Concept: Generalizing from the Wisconsin Case* (1983) Am. B. Found. Res. J. 1, 54-55 ["Basically, Brennan saw the state bar as a public agency created to fund and administer regulatory or governmental programs."].) Second, the court employed language reminiscent of its commerce clause decisions. This suggests that the state's regulatory or police power, similar in scope to Congress' commerce clause power (see *ante,* fn. 2), was the actual source of authority underlying integration of the bar. (Accord *Herron v. State Bar* (1944) 24 Cal.2d 53, 64 [147 P.2d 543].) Both these points emphasize the court's identification of the justifying governmental interest as the advancement of the delivery of quality legal services to the public. Finally, the court implicitly balanced the state's interest in regulating the legal profession with what, in that case, appeared to be a minimal intrusion

into the attorneys' associational and speech rights.[3] (Schneyer, *The Incoherence of the Unified Bar Concept, supra,* at p. 51.)

The court managed to avoid the plaintiff's claim that the bar's use of his mandatory dues to support political activities violated the First Amendment by finding the record insufficiently developed in this regard. (*Lathrop, supra,* 367 U.S. 820, 845-846 [6 L.Ed.2d 1191, 1206-1207].) It is significant to the case before us, however, that only four of the justices deemed the constitutional issue not ripe for adjudication (Chief Justice Warren and Associate Justices Brennan, Clark and Stewart), while five justices considered the issue to be squarely presented. Of these five, two found the use of objecting members' mandatory dues for political purposes to be constitutional (*id.* at p. 865 [6 L.Ed.2d at pp. 1217-1218] [Harlan, J., conc. in judgment, joined by Frankfurter, J.]), two found such use to be unconstitutional (*id.* at p. 871 [6 L.Ed.2d at p. 1221] [Black, J., dis.]; *id.* at pp. 884-885 [8 L.Ed.2d at pp. 1228-1229] [Douglas, J., dis.]), and one considered the practice of law to be a "special privilege" and thus not a "right" protected by the First Amendment.[4] (*Id.* at p. 865 [6 L.Ed.2d at p. 1218] [Whittaker, J., conc. in result].) Moreover, because the *Lathrop* majority explicitly detailed the particular facts it would have needed to address the First Amendment question (*id.* at pp. 846-847 [8 L.Ed.2d at p. 1207]), it appears that, had the record been sufficiently developed in these regards, the entire court would have agreed that the First Amendment issue was squarely presented. Indeed, the court subsequently characterized *Lathrop* by stating that "[t]he only proposition about which a majority of the Court in *Lathrop* agreed was

[3] The court emphasized that "the bulk of State Bar activities" were involved in raising educational and ethical standards, with the ultimate objective of improving the quality of legal services available to the public. (*Lathrop, supra,* 367 U.S. 820, 843 [6 L.Ed.2d 1191, 1205].) Thus, the court found that the allocation of bar resources to political activities was minimal. More recent decisions have established, however, that even slight interference with an individual's speech or associational rights violates the First Amendment. (*Teachers* v. *Hudson, supra,* 475 U.S. at pp. 304-305 [89 L.Ed.2d at p. 246, 106 S.Ct. at p. 1075]; *Ellis* v. *Railway Clerks, supra,* 466 U.S. at pp. 442-444 [80 L.Ed.2d 428, 438-439].)

Further, the court indicated that because the membership requirement was limited "to the compulsory payment of reasonable annual dues," it considered insignificant any infringement upon members' associational rights. (*Lathrop, supra,* 367 U.S. at p. 843 [6 L.Ed.2d at p. 1205].) Again, recent cases establish that the First Amendment protects an individual's rights not to associate and not to speak—the so-called "negative speech rights"—just as it protects an individual's rights to associate and to speak. (*Pacific Gas & Elec. Co.* v. *Public Util. Comm'n* (1986) 475 U.S. 1, 10-11 [89 L.Ed.2d 1, 8-9, 106 S.Ct. 903]; *Roberts* v. *United States Jaycees* (1980) 468 U.S. 609, 623 [82 L.Ed.2d 462, 475, 104 S.Ct. 3244]; *Abood, supra,* 431 U.S. at pp. 234-235 [52 L.Ed.2d at p. 284]; see also *Board of Education* v. *Barnette* (1943) 319 U.S. 624 [87 L.Ed. 1628, 63 S.Ct. 1178, 147 A.L.R. 674].)

[4] The United States Supreme Court has since "rejected the concept that constitutional rights turn upon whether a government benefit is characterized as a 'right' or as a 'privilege.'" (*Sugarman* v. *Dougall* (1973) 413 U.S. 634, 644 [37 L.Ed.2d 853, 861, 93 S.Ct. 2842] [quoting *Graham* v. *Richardson* (1971) 403 U.S. 365, 374 (29 L.Ed.2d 534, 543, 91 S.Ct. 1848)].)

that the constitutional issues should be reached." (*Abood, supra,* 431 U.S. at p. 233, fn. 29 [52 L.Ed.2d at p. 283].)

Thus, at the very least, *Lathrop, supra,* 367 U.S. 820, supports the proposition that use of the mandatory bar dues of objecting members for political and ideological purposes presents a clear constitutional question. Subsequent cases have established that even the generalized allegations found wanting in *Lathrop* are sufficient to raise the First Amendment challenge. (See *Abood, supra,* 431 U.S. at p. 241 [52 L.Ed.2d at p. 288]; *Arrow* v. *Dow* (10th Cir. 1981) 636 F.2d 287, 289.)

The majority in this case avoids the constitutional issue by labeling the State Bar as a "governmental agency," and concluding that a "governmental agency may use *unrestricted* revenue . . . for any purposes within its authority." (Maj. opn, at p. 1167, italics added.) What the majority fails to recognize, however, is that under federal constitutional law the use of objecting members' mandatory dues for political or ideological purposes is *not unrestricted*. *Abood, supra,* 431 U.S. 209, and its progeny make this abundantly clear as I shall further explain in the following section.

Further, the majority's effort to distinguish the California State Bar from the integrated bars of other states, including Wisconsin, whose courts have uniformly applied the *Abood* holding to analyze the question of use of mandatory bar dues (see *post*, pp. 1180-1181), is unpersuasive. Simply saying that none of these states' bars "rest upon a constitutional and statutory structure comparable to that of the California State Bar" does not explain why such a distinction renders the California State Bar immune from the First Amendment constraints, while the Wisconsin Bar is not. The United States Supreme Court's decision in *Lathrop, supra,* 367 U.S. 820, clearly supports the proposition that an integrated bar's use of mandatory dues of objecting members for political or ideological causes is subject to constitutional scrutiny. It was not until the decision in *Abood* v. *Detroit Board of Education, supra,* 431 U.S. 209, however, that the court explicated the First Amendment issue.

C. *The Constitutional Issue*

In *Abood,* the United States Supreme Court first addressed the constitutional issues raised when a union, or, as I would hold, an integrated state bar, spends objecting members' dues for political or ideological purposes. Because the freedom to associate for the purpose of advancing ideas and beliefs is protected by the First Amendment, the court reasoned that "contributing to an organization for the purpose of spreading a political message is protected by the First Amendment." (*Abood, supra,* 431 U.S. at p. 234 [52

L.Ed.2d at p. 284].) Recognizing further that the First Amendment is violated when one is "compelled to make, rather that prohibited from making, contributions for political purposes" (*id.*), the court concluded that the Constitution "prohibit[s the state] from requiring [an individual] to contribute to the support of an ideological cause he may oppose as a condition of holding a job . . . ." (*Id.* at p. 235 [52 L.Ed.2d at p. 284].)[5]

Thus, *Abood* holds that the First Amendment prohibits the state from coercing an individual, by threatening the loss of his livelihood, to financially support ideological or political causes to which he objects. (*Abood, supra,* 431 U.S. 209, 235-236 [52 L.Ed.2d at pp. 284-285]; *Ellis, supra,* 466 U.S. 435, 455 [80 L.Ed.2d 428, 446]; cf. *Wooley* v. *Maynard* (1977) 430 U.S. 705, 715 [51 L.Ed.2d 752, 762-763, 97 S.Ct. 1428]; *Pacific Gas & Electric Co.* v. *Public Util. Comm'n, supra,* 475 U.S. at p. 9 [89 L.Ed.2d at pp. 7-8]; *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74, 100 [64 L.Ed.2d 741, 764, 100 S.Ct. 2035].) The event that triggers the constitutional inquiry is the state's authorizing, or compelling, support of political or ideological causes through the coercive threat of the loss of one's livelihood for refusing to contribute. Attorneys are forced to join the State Bar as a condition precedent to practicing law in the state, just as employees are forced to support unions under provisions for union and agency shops. While the state's need to regulate the legal profession may justify such coercion, it does not justify compulsory financial support of political or ideological causes by objecting members.

Thus, when the State Bar spends a portion of compulsory membership dues on political or ideological causes rather than on regulatory functions, the identical First Amendment concerns which faced the United States Supreme Court in *Abood, supra,* 431 U.S. 209, are presented. Recognizing these concerns, every other court that has considered First Amendment challenges to state bar political expenditures has applied the *Abood* analysis. (See *Gibson* v. *The Florida Bar* (11th Cir. 1986) 798 F.2d 1564, 1568; *Falk* v. *State Bar of Michigan* (1981) 411 Mich. 63, 106 [305 N.W.2d 201, 213] [*Falk I*]; *Falk* v. *State Bar of Michigan* (1983) 418 Mich. 270, 290-91 [342

---

[5] In *DeMille* v. *American Fed. of Radio Artists* (1947) 31 Cal.2d 139 [187 P.2d 769, 175 A.L.R. 382], this court rejected the plaintiff's contention that union expenditure of a special assessment for a political cause with which he disagreed was compelled speech and thus violated the First Amendment. We distinguished the political use of compelled union fees from the flag salute cases (e.g., *Board of Education* v. *Barnette, supra,* 319 U.S. 624) by reasoning that the "member and the association are distinct. The union represents the common or group interests of its members, as distinguished from their personal or private interest." (*DeMille, supra,* at p. 149.) We held that once the member pays any dues or assessments to the association, they "become the property of the association and any severable or individual interest therein ceases upon such payment." (*Ibid.*) *Abood, supra,* 431 U.S. 209, *Ellis, supra,* 466 U.S. 435 and *Hudson, supra,* 475 U.S. 292 have since invalidated this line of reasoning.

N.W.2d 504, 410] [*Falk II*], cert. den. (1984) 469 U.S. 925 [83 L.Ed.2d 253, 105 S.Ct. 315]; *Reynolds* v. *State Bar of Montana* (Mont. 1983) 660 P.2d 581, 581-582 [40 A.L.R.4th 669] [without citing *Abood,* court ordered refund to objecting members of dues spent for political activities]; *Petition of Chapman* (1986) 128 N.H. 24, 35-36 [509 A.2d 753, 755] [N.H. State Bar]; *Arrow* v. *Dow* (D.N.M. 1982) 544 F.Supp. 458, 460 [N.M. State Bar]; *Schneider* v. *Colegio de Abogados de P.R.* (D.P.R. 1983) 565 F.Supp. 963, 965, on remand, (D.P.R. 1988) 682 F.Supp. 674, 683-684 [bar association of P.R.]; *Hollar* v. *Government of the Virgin Islands* (3d Cir. 1988) 857 F.2d 163, 170 [bar association of the Virgin Islands].)[6]

I would join the jurisdictions that apply *Abood*'s constitutional analysis. Indeed, as the cited decisions clearly demonstrate, federal constitutional law compels that analysis. As I explain in the next section, simply labeling the State Bar as a "governmental agency" does not, the majority to the contrary notwithstanding, exempt this case from First Amendment analysis.

II. *Governmental Expenditure of Mandatory Dues Is Not Equivalent to Governmental Expenditure of Taxes*

The majority errs further in broadly stating—without benefit of authority—that a "governmental agency may use unrestricted revenue, whether derived from taxes, dues, fees, tolls, tuition, donation, or other sources, for any purposes within its authority." (Maj. opn. at p. 1167.) I agree that such a rule would apply to revenue derived from general taxes. It is well established that taxpayers may be required to financially support governmental programs and messages to which they are ideologically or conscientiously opposed. (See, e.g., *Graves* v. *Commissioner* (6th Cir. 1978) 579 F.2d 392, 392 [Quakers must pay income tax despite contravention of religious principles]; *Autenreith* v. *Cullen* (9th Cir. 1969) 418 F.2d 586, 588 [conscientious objector must pay income tax despite use of taxes to fund warfare]; *Crowe* v. *Commissioner* (8th Cir. 1968) 396 F.2d 766, 767 [citizen must pay income tax despite disagreement with use of taxes to support federal welfare system]; *United States* v. *Lee* (1982) 455 U.S. 252, 262 [71 L.Ed.2d 127, 135, 102 S.Ct. 1051][Amish employer must pay social security tax despite contravention of religious principles].)

---

[6] In a pre-*Abood* constitutional challenge to state bar expenditures for political and ideological causes (*Sams* v. *Olah* (1969) 225 Ga. 497 [169 S.E.2d 790]), the Georgia Supreme Court quoted its holding in *Machinists* v. *Street* (1961) 217 Ga. 351 [122 S.E.2d 220], after remand in 367 U.S. 740 [6 L.Ed.2d 1141, 1165, 81 S.Ct. 1784]: "[A] labor union might be enjoined from using its funds for political purposes against the wish of an individual member, [because] this was a use of funds for purposes other than collective bargaining, the legitimate purpose of the union . . . ." (*Sams, supra,* 225 Ga. at p. 508.) Thus the *Sams* court applied essentially the same reasoning the United States Supreme Court later used in *Abood, supra,* 431 U.S. 209.

Similarly, I perceive no First Amendment violation in the expenditure of revenues from license fees for purposes substantially related to regulation of the particular profession or industry. Indeed, this court has validated the State Bar Act "as a regulatory measure under the police power . . . and . . . held that the reasonable expenses necessary to pay the costs of enforcement of the act . . . may be imposed upon the membership in the form of fees or dues. [Citations.]" (*Herron* v. *State Bar, supra,* 24 Cal.2d at p. 64.)

We face a far different situation, however, when we consider the expenditure by a state agency of dues paid by a small and limited segment of the public, imposed as a condition precedent to the exercise of a profession, and expended for purposes not related to regulation of the profession. The Court of Appeal decisions to which the majority points do not support its conclusion that the source of revenue is "immaterial" to a determination of the propriety of its expenditure. To the contrary, when the revenue in question is derived from mandatory dues as a condition precedent to the practice of a profession, the ends to which the money is devoted are highly material.

In *Miller* v. *California Com. on Status of Women* (1984) 151 Cal.App.3d 693 [198 Cal.Rptr. 877], the plaintiffs filed a "taxpayers' action for declaratory and injunctive relief seeking to abolish the commission . . . ." (*Id.* at pp. 695-696.) Without explicitly denoting the source of funds, the opinion refers throughout to the commission's use of "public resources," and in the predecessor case (*Miller* v. *Miller* (1978) 87 Cal.App.3d 762 [151 Cal.Rptr. 197]), to the use of "public funds," to fund the commission's expenses. Because of the absence of any contrary indication in either of the *Miller* opinions or in Government Code section 8240 et seq. authorizing formation of the commission, one can only deduce that the "public resources" or "public funds" referred to in the *Miller* decisions were general taxes. Consequently, *Miller* stands only for the proposition that a governmental agency may spend funds derived from general taxes for any purposes within its authority, a concept well supported by precedent, but unchallenged in, and inapposite to, the case before us.

The other decision to which the majority refers, *Erzinger* v. *Regents of University of California* (1982) 137 Cal.App.3d 389 [187 Cal.Rptr. 164], involved a claim by university students that their right to the free exercise of religion was violated by a portion of their mandatory registration fee being used to provide abortions, abortion counseling and abortion referrals through the student health services. The Court of Appeal analogized the payment of student registration fees to the payment of taxes, and applied a well settled line of authority holding that the "right to free exercise of religion does not justify refusal to pay taxes . . . ." (*Id.* at p. 393 [citing *Autenreith* v. *Cullen, supra,* 418 F.2d 586].) Whether or not the Court of

Appeal correctly analogized student registration fees to general taxes is debatable, but in any event this court is not bound by *Erzinger.* More importantly, I do not consider the issues in the two cases sufficiently similar to make *Erzinger* applicable to the instant case.

The students in *Erzinger* charged the University was interfering with their right to free exercise of religion, not their speech and associational rights. Unlike plaintiffs here, the *Erzinger* plaintiffs were not compelled to become members in an association, the threshold event which triggers First Amendment scrutiny of governmental action for violation of the constitutionally protected speech and associational rights. (See *ante,* p. 1180.) Furthermore, the registration fees at issue in *Erzinger* were used strictly to finance health care within the paying group, as compared to the instant case where the State Bar fees at issue are allegedly used in part to promote political and ideological causes of concern to the general public.

Moreover, a student denied admission for failure to pay registration fees has more options, and is injured far less, than an attorney denied the right to practice law for failure to pay bar dues. It is obviously a greater hardship for the attorney to move to a different state and qualify there for admission to practice than it is for a student to enroll in a different college or university. Consistent with this distinction, courts have recognized that the pursuit of one's livelihood, be it the practice of law or some other profession, is a fundamental right. (*Supreme Court of New Hampshire* v. *Piper* (1985) 470 U.S. 274, 281 [84 L.Ed.2d 205, 211, 105 S.Ct. 1272]; *Anton* v. *San Antonio Community Hosp.* (1977) 19 Cal.3d 802, 823 [140 Cal.Rptr. 442, 567 P.2d 1162].)[7]

Further, the purported analogy between taxes and mandatory dues has been questioned, and rejected, by courts and commentators alike. In *Young Americans for Freedom* v. *Gorton* (1978) 91 Wn.2d 204 [588 P.2d 195], for example, the plaintiffs sought to prevent the Washington State Attorney General from using general tax revenues to finance the filing of amicus curiae briefs in support of ideas to which the plaintiff taxpayers objected. The plaintiffs argued that taxes are the equivalent of mandatory union dues and thus the attorney general's use of taxes to fund advocacy of ideas was

---

[7]In determining that a physician's hospital privileges are a vested fundamental right, the court held that a primary consideration was whether the interest in question " 'directly relates to the pursuit of [one's] livelihood.' " (*Anton* v. *San Antonio Community Hosp., supra,* 19 Cal.3d at p. 823 [quoting *Edwards* v. *Fresno Community Hosp.* (1974) 38 Cal.App.3d 702, 705 (113 Cal.Rptr. 579, 3 A.L.R.4th 1209)].) By this standard, the practice of law is clearly a fundamental vested right. This conclusion is further supported by the United States Supreme Court's determination that the right to practice law is fundamental and thus protected by the privileges and immunities clause. (*Supreme Court of New Hampshire* v. *Piper, supra,* 470 U.S. at p. 281 [84 L.Ed.2d at p. 211].)

proscribed by *Abood, supra,* 431 U.S. 209. The Washington Supreme Court found "no viable merit" to the plaintiff's contention that general taxes and union dues are interchangeable sources of revenue for First Amendment purposes. (*Id.* at p. 200.)

Federal courts, in considering constitutional challenges to the use of integrated bar membership dues for political activities, have consistently rejected the claim that they have no jurisdiction by operation of statutes that prevent the federal courts from considering questions concerning the proper use of state taxes. (*Levine v. Supreme Court of Wisconsin* (W.D.Wis. 1988) 679 F.Supp. 1478, 1488-1489 overruled on other grounds in *Levine v. Heffernan* (7th Cir. 1988) 864 F.2d 457 [Tax Injunction Act, 28 U.S.C. § 1341]; *Schneider v. Colegio de Abogados de Puerto Rico* (D.P.R. 1982) 546 F.Supp. 1251, 1275 [Butler Act, 48 U.S.C. § 872].)

In *Abood, supra,* 431 U.S. 209, Justice Powell observed that "[c]ompelled support of a private association [by payment of dues was] fundamentally different from compelled support of government [by payment of taxes because] government is representative of the people . . . [while] a union . . . is representative only of one segment of the population, with certain common interests." (*Id.* at p. 259, fn. 13 [52 L.Ed.2d at p. 299] [Powell, J., conc.].)

Commentators have offered various reasons to distinguish taxes from mandatory dues for First Amendment purposes. Some have suggested that, as a practical matter, the sheer number of taxpayers and the complexity of government financing preclude making the *Abood* analysis applicable to objecting taxpayers. (Cantor, *Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association* (1983) 36 Rutgers L.Rev. 3, 24, fn. 125 [citing *United States v. Lee, supra,* 455 U.S. at pp. 259-261 (71 L.Ed.2d at pp. 133-135)].) Others explain the distinction by arguing that the impact on objecting taxpayers from government "ideological" expenditures is less intrusive than the impact of controversial expenditures on dissenting union fees payors. (Tribe, American Constitutional Law (2d ed. 1988) § 12-4, fn. 14, p. 808.)

Whether or not one finds these arguments persuasive, one point is clear; a majority of the justices in *Lathrop v. Donohue, supra,* 367 U.S. 820, found that the use of mandatory state bar dues for philosophical, political or ideological causes implicates First Amendment concerns and principles. (See *ante,* pp. 1178-1179.) Labelling the State Bar a "governmental agency" cannot divert us from the First Amendment inquiry which *Lathrop, supra,* 367 U.S. 820, and *Abood, supra,* 431 U.S. 209, direct.

The majority engages in pure sophistry when it states that "no precedent supports the imposition of such [First Amendment] restrictions on a governmental agency." (Maj. opn. at p. 1169.) What the majority refuses to recognize is that most of the cases involving constitutional challenges to, and limitations on, the use of mandatory bar dues involved *governmental agencies*—state bar associations. (See, e.g., *Schneider* v. *Colegio de Abogados de P.R., supra,* 546 F.Supp. at p. 1264 [applying governmental immunity to Puerto Rican bar association because in disciplinary proceedings the bar acts in a prosecutorial capacity pursuant to statute]; *Falk* v. *State Bar of Michigan, supra,* 305 N.W.2d at p. 203 [State of Michigan acts through "combined efforts of the Michigan Supreme Court, Legislature and State Bar"]; *Petition of Chapman, supra,* 509 A.2d at p. 758 [New Hampshire Supreme Court "retains continuing supervisory authority over the [N.H. Bar] Association and its activities"]; *Arrow* v. *Dow, supra,* 544 F.Supp. at p. 459 ["control of dues [is] subject to the supervision of the New Mexico Supreme Court"]; *Sams* v. *Olah, supra,* 225 Ga. at p. 501 [Georgia State Bar is an "administrative arm of the [Georgia Supreme C]ourt"]; *Reynolds* v. *State Bar of Montana, supra,* 660 P.2d at p. 582 [Weber, J., dis.] [Montana Supreme Court "has the power to control the organization of the State Bar"]; *Hollar* v. *Government of Virgin Islands, supra,* 857 F.2d at p. 167 [Virgin Islands Bar Association acts as prosecutor for the district court in attorney disciplinary proceedings].) These cases indisputably subjected state bars to the First Amendment scrutiny mandated by *Abood.* (*Ante,* pp. 1180-1181.) None of these cases analyzed the constitutional issue in terms of whether the relevant state bar was a governmental agency or private association. Instead, these cases reflect the recognition that *compelled membership* subjects an association—whether private or governmental—to First Amendment constraints.

Indeed, while the majority agrees that "all *Lathrop* decided was that the *constitutional issues* concerning the use of bar dues *should be decided;* it did not decide those issues" (maj. opn. at p. 1162, italics added [citing *Abood, supra,* 431 U.S. at p. 233, fn. 29 (52 L.Ed.2d at p. 283)]), the majority fails to reconcile its position with that of the United States Supreme Court: Since "the [Wisconsin] State Bar is a public and not a private agency" (*Lathrop* v. *Donohue* (1960) 10 Wis.2d 230, 242 [102 N.W.2d. 404]), the United States Supreme Court obviously considered public, or governmental, agencies to be subject to First Amendment scrutiny.

Moreover, other jurisdictions have recognized that the First Amendment constrains governmental agencies which compel membership. In *Good* v. *Associated Students of Univ. of Washington* (1975) 86 Wn.2d 94 [542 P.2d 762], for example, the Washington Supreme Court held that "the state, through the university, may not *compel membership* in an association, such

as the [Associated Students of the University of Washington because] . . . [t]hat association expends funds for *political and economic causes to which the dissenters object* and promotes and espouses political, social and economic philosophies which the dissenters find repugnant to their own views. *There is no room in the First Amendment for such absolute compulsory support, advocation and representation.*" (*Id.* at p. 768, italics added.) In *Galda* v. *Bloustein* (3d Cir. 1982) 686 F.2d 159 the plaintiffs objected to a governmental agency, the State University of New Jersey (Rutgers), requiring students to pay refundable fees to support the New Jersey Public Interest Research Group (PIRG). Acknowledging Rutgers's authority to levy and collect mandatory student fees, the court nevertheless held that *Abood* prevented it from requiring student support of PIRG if the plaintiffs could prove that PIRG supported political or ideological causes to which they objected.

Thus, the majority's assertion that subjecting governmental agencies to First Amendment restrictions is unprecedented does not withstand scrutiny. On the contrary, the weight of authority supports the view that when a state requires membership in a governmental entity, the authorized use of compelled dues for political or ideological purposes to which its members object is subject to constitutional constraints.[8]

The issue left unresolved by *Lathrop,* whether the First Amendment is violated by the State Bar's use of mandatory dues for political or ideological causes to which some members object, has subsequently been addressed by analogy in the United States Supreme Court's union decisions. (See *Ellis, supra,* 466 U.S. 435; *Hudson, supra,* 475 U.S. 292.) These cases establish the constitutional standard by which State Bar expenditures must be scrutinized.

---

[8] The majority asserts that the position advocated in this concurring and dissenting opinion would subject the State Bar to the "worst of both the private and the governmental worlds" by, on the one hand, subjecting it to constitutional restrictions in its use of dues and, on the other hand, precluding it as a state agency from endorsing political candidates and engaging in political campaigns. (Maj. opn., *ante,* at p. 1169, fn. 19.)

What this assertion fails to recognize is that if an association derives the benefit of the force of government to compel individuals to join the association and pay membership dues, then that association should be limited in its use of those dues and that indeed such limitation is commanded by the First Amendment to the United States Constitution. Such indifference to the First Amendment rights of the 115,000 members of the California State Bar is remarkable stemming as it does from acknowledged champions of First Amendment liberties. By focusing on the distinction between private and governmental entities, the majority's approach gives the State Bar the best of both worlds, and State Bar members the worst of both worlds. In contrast, by focusing on the distinction between compulsory and voluntary association, the concurring and dissenting opinion strikes a balance between the rights of the State Bar and its members.

III. *The Constitutionality of Expending Objecting Members' Dues for Political and Ideological Causes*

A. *The Constitutional Standard*

A threshold issue precedent to any First Amendment analysis is whether the State Bar is legally authorized to make the expenditures to which plaintiffs object. Indeed, if the objectionable expenditures are precluded by statute or decisional law, there is no need for further inquiry. (*Ellis, supra,* 466 U.S. at pp. 444-445 [80 L.Ed.2d at pp. 439-440].)

The State Bar is, as the majority point out, statutorily authorized to expend funds for a broad range of activities.[9] (See maj. opn., *ante,* at p. 1169.) However, it is only if, or when, an expenditure *is authorized* by law that we are required to analyze the constitutionality of the expenditure of objecting members' mandatory dues under the First Amendment. (*Ellis, supra,* 466 U.S. at p. 447 [80 L.Ed.2d at p. 441].)

The majority has properly identified *Ellis* v. *Railway Clerks, supra,* 466 U.S. 435 as the authority explicating the First Amendment analysis of expenditure by a compulsory association—either union or bar association—of objecting members' dues for political or ideological causes. *Ellis* mandates a three-step analysis to determine which political and ideological activities may be funded by mandatory dues over members' objections.

First, it must be determined whether the activity is "germane" to the purpose which justified compulsory membership in the bar in the first place. (466 U.S. at p. 447 [80 L.Ed.2d at p. 441].) The governmental interest in the delivery of quality legal services to the public and the improvement of the legal profession have been held sufficient to justify the infringement of First Amendment rights that may occur when attorneys are required to become bar members. (*Lathrop* v. *Donohue, supra,* 367 U.S. at p. 843 [6 L.Ed.2d at p. 1205]; see text, *ante,* at p. 1177.) When bar activities serve this interest,[10]

---

[9] In addition to the statutory provisions authorizing the bar to perform various regulatory functions, the Board of Governors is authorized to "aid in all matters pertaining to the advancement of the science of jurisprudence or to the improvement of the administration of justice, including, but not by way of limitation, all matters that may advance the professional interests of the members of the State Bar and such matters as concern the relations of the bar with the public." (Bus. & Prof. Code, § 6031, subd. (a).)

As the majority point out, however, the State Bar as a governmental agency is precluded from participating in election campaigns. (*Stanson* v. *Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1]; see maj. opn., *ante,* at p. 1172.)

[10] The majority apparently equates the statutory *functions* of the State Bar with the state interests that may justify interference with members' associational rights. (See maj. opn., *ante,* at p. 1165, fn. 11.) It is hornbook law, however, that not all statutes rise to a level that justify

or when expenditures are "necessarily or reasonably incurred" to finance activities that serve this interest, then such expenditures are considered "germane." (*Ellis, supra,* 466 U.S. 435 at p. 448 [80 L.Ed.2d at p. 442].)

If an expenditure serves the state's interest in the delivery of quality legal services to the public and the improvement of the legal profession, the second step of the *Ellis* analysis requires that we determine "whether these expenses involve additional interference with the First Amendment interests of objecting employees . . . ." (466 U.S. at p. 456 [80 L.Ed.2d at p. 447].) Finally, if the activities funded by the questioned expenditure do involve additional interference with First Amendment rights, we must determine "whether they are nonetheless adequately supported by a governmental interest." (*Ibid.* [80 L.Ed.2d at p. 447].)

Thus, if a bar activity impinges upon First Amendment interests beyond the interference inherent in compulsory membership in the first instance, the bar must identify a governmental interest that justifies such additional interference. For example, the investigation of charges of attorney misconduct or the administration of the bar examination do not appear to interfere with members' First Amendment interests. Lobbying the Legislature for approval of the bar's proposed budget, however, would seem to implicate bar members' First Amendment rights. Nonetheless, such activity would appear justified by the governmental purposes underlying the requirement of compulsory membership in the State Bar. Without an adequate budget, the bar would be unable to conduct activities designed to advance the delivery of quality legal services to the public and to improve the legal profession.

I do not suggest the governmental interest that may justify additional interference with objecting bar members' First Amendment rights is *limited* to advancing the delivery of quality legal services or to improving the legal profession. As the majority suggests, in some circumstances the state's interest " 'in drawing upon [lawyers'] training and experience' " may adequately justify additional infringement of bar members' First Amendment rights. (See maj. opn., *ante,* at p. 1169 [quoting *Falk I, supra,* 305 N.W.2d 201, 231].) However, it must remain to the State Bar and its members to work out and, if necessary, to future decisions to determine, whether other activities which additionally interfere with objecting State Bar members' First Amendment rights are justified by a sufficient governmental interest. I turn to the activities at issue in this case.

state interference with basic constitutional rights. (See Tribe, American Constitutional Law, *supra,* § 12-2, p. 792.) As stated above, I adopt the United States Supreme Court's explication of the state interests which justify compulsory bar membership because I consider it to be authoritative.

B. *Applying the Standard to the Present Case*

In seeking declaratory relief, plaintiffs challenge the State Bar's expenditure of objecting members' dues to fund the cost of lobbying the Legislature, filing briefs amicus curiae, holding conventions of the State Bar Conference of Delegates, disseminating the speeches of its then president-elect and conducting a public information program concerning the election of justices.

Because this matter comes to us on summary judgment, the record is not sufficiently developed to apply the constitutional standard to most of the expenditures plaintiffs challenge. Thus, I shall undertake to discuss only the constitutional parameters within which the objectionable activities should be analyzed.

1. *Lobbying and Litigation Activities*

The constitutionality of the bar's expenditure of objecting members' dues to fund the cost of lobbying the Legislature or filing amicus curiae briefs cannot be determined in the abstract. The trial court would first have to determine whether the lobbying or litigation activity of which plaintiffs complain serves the governmental interest in advancing the delivery of quality legal services to the public or improving the legal profession. If so, the court would then determine whether the challenged activity involves interference with First Amendment rights beyond that occasioned by compulsory bar membership itself. If it does, the State Bar would have the burden (see *Railway Clerks* v. *Allen* (1963) 373 U.S. 113, 122 [10 L.Ed.2d 235, 241-242, 83 S.Ct. 1158]) of identifying some other governmental interest justifying such additional interference. (*Ellis, supra,* 466 U.S. 435 at p. 456 [80 L.Ed.2d at p. 447].)

2. *Conference of Delegates*

There can be little doubt that some conference activities serve the state's interest in advancing the delivery of quality legal services to the public or in improving the legal profession. It also seems possible that some conference activities do not additionally infringe objecting members' First Amendment rights beyond the infringement inherent in compelled membership.

It appears likely, however, that expenditures for some conference activities would be found to impinge additionally upon objecting members' First Amendment rights. As to these expenditures, the bar would have the opportunity to identify a governmental interest justifying the expenditure. The record before us is insufficient to make this determination. Further, the trial

court made no such determination and it would be the trial court's function in the first instance to do so. Thus, it would remain to the trial court to determine upon sufficient evidence whether any of plaintiffs' dues was expended in violation of their First Amendment rights.

### 3. *Bar Officers' Speeches and Public Information Programs*

Plaintiffs do not object to publication of bar officers' speeches or public information programs in general. Generally, insofar as publication of speeches or information programs serves the state's interest in advancing the delivery of quality legal services to the public or improving the legal profession, the bar may fund such activities with objecting members' mandatory dues. If such activities do serve these interests, the court would have to determine whether the challenged expenditures interfere with objecting members' First Amendment rights beyond the interference inherent in compulsory bar membership. If they do, the court would then determine if the challenged expenditures are nonetheless justified by some other sufficient governmental interest.

I do agree, however, with the majority that President-elect Anthony Murray's speech and the public education materials, by virtue of their content and timing, constituted the adoption of a specific position in a public election. Consequently, I agree that, as a matter of law, such election activities were not legally authorized expenditures under our decision in *Stanson* v. *Mott, supra,* 17 Cal.3d 206. That being so, no further analysis of those expenditures under the First Amendment is necessary.

## IV. *Remedies, Reimbursement and Procedure*

### A. *Declaratory and Injunctive Relief*

To the extent that plaintiffs could, within the purview of their pleadings, establish in further proceedings that the State Bar has used mandatory membership dues of objecting members in excess of its legal authority to expend funds, or in violation of the First Amendment principles I have discussed, plaintiffs should be entitled to the declaratory relief they seek.

To the extent that they have established or could establish that funds were spent in excess of governing legal authority, they should also be entitled to injunctive relief to prevent such expenditures in the future. (*Stanson* v. *Mott, supra,* 17 Cal.3d at p. 223.)

## B. *Reimbursement*

Plaintiffs have requested no monetary relief from the State Bar itself.[11] The only monetary relief plaintiffs have requested is for "an injunction [or writ of mandate to] issue compelling respondent and defendant members of the Board of Governors to reimburse the Treasury of the State Bar of California for all State Bar funds" wrongly expended. The State Bar, however, has not sought reimbursement from defendant governors and the authority of plaintiffs to seek reimbursement on the bar's behalf is dubious at best, as evidenced by plaintiffs' failure to assert any such authority. In any event, I agree with the majority that the governors cannot be held personally liable for reimbursement to the State Bar in view of the historical practices of the bar and in the absence of any record showing the governors knew any expenditures were unauthorized or failed to exercise "reasonable diligence" in authorizing the subject expenditures. (*Stanson* v. *Mott, supra,* 17 Cal.3d at pp. 226-227.)

## C. *Constitutionally Mandated Procedure*

As to expenditures in violation of the First Amendment, the Constitution requires the bar to adopt procedures to allow members to identify the expenditures to which they may legitimately object and to prevent the bar from utilizing objecting members' dues for such purposes. (*Hudson, supra,* 475 U.S. at pp. 302-303 [89 L.Ed.2d at pp. 244-245, 106 S.Ct. at pp. 1073-1074]; *Abood, supra,* 431 U.S. at p. 237, fn. 35 [52 L.Ed.2d at pp. 285-286].)

The majority has described such a procedure as "an extraordinary burden." (Maj. opn., *ante*, at p. 1165.) The procedure the majority envisions would require the bar, "whenever [it] proposed to advise the Legislature or the courts of its views on a matter, [to] *first . . .* engage in the three-step analysis set out in *Ellis* v. *Railway Clerks* (1984) 466 U.S. 435 [80 L.Ed.2d 428, 104 S.Ct. 1883]." (Maj. opn., *ante*, at p. 1165, italics added.) While the procedure envisioned by the majority might be "an extraordinary burden," the procedure mandated by the United States Supreme Court is not nearly so onerous.

As *Hudson, supra,* 475 U.S. at p. 307 [89 L.Ed.2d at p. 247, 106 S.Ct. at p. 1076] makes clear, " '[a]bsolute precision' in the calculation of the charge to [objecting members] cannot be 'expected or required.' [Citations.] Thus, for instance, the [association] cannot be faulted for calculating its fee on the basis of its expenses during the preceding year. The [association] need not provide [objecting members] with an exhaustive and detailed list of all its

---

[11] With the exception of their prayer for costs and attorneys' fees.

expenditures, but adequate disclosure surely would include the major categories of expenses, as well as verification by an independent auditor." (*Id.* at p. 307, fn. 18 [89 L.Ed.2d at p. 247, 106 S.Ct. at p. 1076].)

Therefore, contrary to the majority's assumption, the State Bar would not have to perform the three-step *Ellis* analysis prior to each instance in which it seeks to advise the Legislature or the courts of its view on a matter. Instead, according to *Hudson, supra,* 475 U.S. 292 [106 S.Ct. 1066], the "the constitutional requirements for the [association's] collection of . . . fees include an adequate explanation of the basis for the fee, a reasonably prompt opportunity to challenge the amount of the fee before an impartial decisionmaker, and an escrow for the amounts reasonably in dispute while such challenges are pending." (*Id.* at p. 310 [89 L.Ed.2d at p. 249, 106 S.Ct. at p. 1078].) Since the bar already is statutorily required to submit detailed budgets to the Legislature prior to obtaining approval for setting members' annual dues (Bus. and Prof. Code, § 6140.1), the argument that the constitutionally mandated procedure would create "an extraordinary burden" for the bar is unpersuasive.

While such a procedure would likely result in some additional administrative burden to the bar and perhaps prove at times to be somewhat inconvenient, such additional burden or inconvenience is hardly sufficient to justify contravention of the constitutional mandate. It is noteworthy that unions representing government employees have developed, and have operated successfully within the parameters of, *Abood* procedures for over a decade.[12] (See Morris, The Developing Labor Law (2d ed. 1983) ch. 29, p. 1417.) Indeed, the Michigan State Bar has operated under a modified *Abood* procedure since 1985. (Admin. Order No. 1985-1 (1985) 420 Mich. lviii.) I have no doubt whatever the State Bar could, by adapting the *Hudson* procedures or otherwise, devise procedures that are workable, practical and meet the constitutional requirements set out in *Teachers* v. *Hudson, supra,* 475 U.S. 292.

---

[12] The majority suggests that the "more limited functions and constituency" of a labor union (maj. opn. fn. 12, *ante,* at p. 1166) properly subject it to *Ellis* analysis, while the State Bar's improvement of the administration of justice function render it inappropriate for application of the constitutionally mandated *Ellis* test. The majority's equation of statutory functions with justifying state interests again leads it astray. As I have shown, the relevant initial inquiry must be to determine which state interests justified compulsory bar membership in the first instance. Without benefit of briefing by the parties, I hesitate to make this determination unilaterally. I note, however, that at the time of integration of the bar, improvement of the "administration of justice" connoted interests far narrower than those the majority now ascribes to the phrase. (See, e.g., Winters, Bar Association Organization and Activities (1954) p. 171 [defining the field of the administration of justice as "[t]he organization, personnel and operation of the courts, the bar and their allied agencies and institutions"].)

## V. *Conclusion*

For the foregoing reasons, with the exception of the cause asserting the governors' personal liability to reimburse the State Bar for expenditures made in violation of *Stanson* v. *Mott, supra,* 17 Cal.3d 206, I would affirm the Court of Appeal judgment with directions to remand the case to the trial court for further proceedings consistent with this opinion.

Panelli, J., and Agliano, (Nat A.), J.,* concurred.

---

*Presiding Justice, Court of Appeal, Sixth Appellate District, assigned by the Chairperson of the Judicial Council.