[No. D057785. Fourth Dist., Div. One. July 13, 2011.]

THOMAS C. KUNDE, Plaintiff and Appellant, v.
DEBORAH SEILER, as Registrar of Voters, etc., Defendant and
Respondent;
CENTRAL COMMITTEE OF THE REPUBLICAN PARTY OF SAN
DIEGO COUNTY, Real Party in Interest and Respondent.

## COUNSEL

Strumwasser & Woocher, Gregory G. Luke and Byron F. Kahr for Plaintiff and Appellant.

Thomas E. Montgomery, County Counsel, and Timothy M. Barry, Deputy County Counsel, for Defendant and Respondent.

Bell, McAndrews & Hiltachk and Charles H. Bell, Jr., for Real Party in Interest and Respondent.

## OPINION

IRION, J.—Elections Code[1] section 13305 permits the county central committee of a qualified political party to include a party contributor envelope or a one-page letter in the official mailing of the sample ballot sent to registered members of its own party in a direct primary election, provided that the central committee (1) pays all associated expenses; (2) does not include words critical of another political party; (3) provides a space for the name and address of the contributor; and (4) informs the contributor how contributions will be spent. In this appeal from a ruling on a petition for a writ of mandate filed shortly before the June 2008 direct primary election, we consider whether, as petitioner Thomas C. Kunde contends, the Republican Party of San Diego (the Party) should not have been permitted to include a one-page letter pursuant to section 13305 that—along with a request for contributions—contained electioneering materials stating the Party's positions on various local election contests and one statewide ballot measure.

As we will explain, we agree with the trial court that section 13305 permits the inclusion of the electioneering materials proposed by the Party. We further reject Kunde's contention that, so interpreted, section 13305 violates the First Amendment and equal protection rights of groups and

---

[1] Unless otherwise indicated, all further statutory references are to the Elections Code.

persons not permitted by section 13305 to insert their own electioneering materials in the sample ballot mailing. We accordingly affirm the judgment.

I

## FACTUAL AND PROCEDURAL BACKGROUND

In the June 2010 direct primary election, the Party made a request to San Diego County Registrar of Voters Deborah Seiler (the Registrar) that a ballot insert from the Party (the proposed insert) be included in the sample ballots sent to registered Republican voters in San Diego County supervisorial districts 1, 4 and 5.[2]

The request was made pursuant to former section 13305, which at the time provided (Stats. 1994, ch. 920, § 2, p. 5060):

"(a) In each county, the county central committee of each qualified political party[3] may supply to its county elections official, not less than 83 days prior to the direct primary election, a party contributor envelope or a one-page letter, in which both sides may be utilized, to be included in the mailing of the sample ballot to each of that political party's registered voters in the county. In lieu of supplying the elections official with a sufficient number of copies of the one-page letter, a county central committee may supply the elections official, not less than 83 days before the direct primary election, with the text of the letter and request the elections official to print, or cause to be printed, a sufficient number of copies of the letter to accommodate the mailing. The elections official shall notify the respective county committee of, and the committee shall reimburse the county for, any actual costs incurred by the inclusion or printing, or both. The elections official may, prior to acting pursuant to this subdivision, require the county committee to post a bond to ensure the reimbursement.

"(b) Each envelope or letter shall contain a space for the name and address of the contributor, and shall contain language which informs the contributor of the manner in which the money received shall be spent. The language on the envelope or letter shall not contain words critical of any other political party.

---

[2] Approximately a month before each election, a sample ballot is sent to all registered voters by election officials. (§ 13303.)

[3] The definition of "qualified political party" is set forth in section 5100, which provides that a "party is qualified to participate in any primary election" under any of the following conditions: (a) during the last gubernatorial election any one of its candidates received at least 2 percent of the statewide vote; (b) at least 1 percent of the state's voters have declared their intention to affiliate with the party by the 135th day before the primary election; or (c) a petition signed by at least 10 percent of the state's voters is submitted to the Secretary of State.

"(c) All funds received by the return of the party contributor envelopes or in response to the letters shall be kept separate from all other funds and shall be kept in a fund (account) to be established in each county. Any funds which are prohibited under federal law from being used for candidates for federal office shall be further segregated and any portion allocated to candidates shall be disbursed only to candidates for state office."

The proposed insert was set forth on two sides of a standard-size piece of paper, with each side of the paper split into two columns, apparently intended to be folded into a booklet. One of the four columns was a fundraising letter from the Party, signed by its chairman. The letter opened by stating that the Party "supports the candidates and ballot measures featured inside" as "[e]ach is committed to protecting taxpayers and stabilizing the finances of local government," and stated that "[y]our vote for these candidates and ballot measures can help get San Diego back on track." The letter also asked that contributions to the Party be made by phone or through the Internet to support "voter registration activities, Republican candidates for local and state office, voter education and member communication programs."

The other three columns of the proposed insert described candidates and ballot measures supported by the Party. One column was titled "Voter Guide for Local Propositions" and set forth the Party's position on one statewide proposition, local measures from San Diego County, the City of San Diego, the City of Chula Vista and the City of Oceanside, and included advocacy for the Party's position. The remaining two columns identified candidates that the Party supported for local nonpartisan offices:[4] (1) five candidates for San Diego County offices (county supervisor, district attorney, treasurer-tax collector and assessor-recorder); (2) a candidate for the San Diego Unified School District board; (3) a candidate for San Diego City Council; (4) three candidates for Chula Vista city offices (mayor, city attorney, city council); and (5) a candidate for Oceanside City Council. For each candidate, the proposed insert included at least two sentences describing their merits.

The Registrar posted the proposed insert for public comment. Kunde, who is a voter registered with the Democratic Party and resides in San Diego County supervisorial district 4, filed a petition for writ of mandate on April 5, 2010, against the Registrar and named the Party as a real party in interest. The petition sought an order prohibiting the Registrar from including the proposed insert in the mailing of the sample ballot. Kunde argued that

---

[4] The California Constitution provides that "[a]ll judicial, school, county, and city offices, including the Superintendent of Public Instruction, shall be nonpartisan." (Cal. Const., art. II, § 6, subd. (a).)

inclusion of the proposed insert was not permitted by section 13305 and would "violate the constitutional guarantees of equal protection of the law and freedom of speech."

The petition was set for hearing on April 13, 2010. Kunde argued in his memorandum of points and authorities in support of the petition that (1) the proposed insert did not comply with section 13305 because it did not contain "a space for the name and address of the contributor" as statutorily required (§ 13305, subd. (b)); (2) section 13305 does not authorize an insert containing electioneering materials, such as political advertisements for candidates and measures; and (3) inclusion of the proposed insert containing electioneering materials would violate constitutional guarantees of equal protection and free speech by excluding some persons from a government subsidized forum.

The Party opposed the petition. It did, however, concede that the proposed insert lacked a space for the name and address of the contributor as required by section 13305, subdivision (b), and it therefore submitted a revised proposed insert that contained a small form at the bottom of one of the columns which a contributor could cut out, complete and mail in with a contribution.

Evidence submitted to the trial court included an invoice that the Registrar sent to the Party, charging it approximately $23,000 for the expense of setting up and printing the proposed insert. It appears that the Party was not charged any postage costs by the Registrar because the one-page insert did not increase the cost of postage for the sample ballot.

The trial court granted the petition in part and denied it in part. Specifically, the trial court granted the petition insofar as it ruled that the Party would be required to use the revised proposed insert that contained a space for the contributor's name and address. It denied the petition in all other respects, concluding that section 13305 did not prohibit the Party from including endorsements of candidates and measures in the proposed insert. The trial court did not expressly discuss Kunde's constitutional arguments.[5]

---

[5] We note that at one point in its ruling, the trial court stated that "[n]o constitutional challenge was made to section 13305." However, at another point in its ruling, the trial court more accurately described Kunde's as-applied constitutional argument, noting that Kunde had not "challenged the overall constitutionality of the section itself," but that Kunde's constitutional challenge "is to the specific content of the statement prepared . . . on this occasion." The trial court did not expressly address the constitutional challenge. Apparently relying on the trial court's statement that "[n]o constitutional challenge was made to section 13305," the Party argues on appeal that Kunde did not raise a constitutional challenge in the trial court. We reject that argument. The record is replete with Kunde's arguments that if section 13305 is interpreted to allow the type of electioneering materials included in the proposed insert, it would violate the constitutional guarantees of equal protection and free speech.

## II

## DISCUSSION

Kunde appeals from the judgment, asserting the same arguments that he did in the trial court—namely that section 13305 does not permit electioneering materials, and that if section 13305 is interpreted to permit electioneering materials such as those included in the proposed insert, it would violate the equal protection and First Amendment rights of persons who are not given access to the electioneering forum created by section 13305. Both the Party and the Registrar have filed briefs in opposition.

### A. We Will Consider the Appeal Even Though Effective Relief Can No Longer Be Granted

As an initial matter we discuss whether the dispute is moot. As the Party points out, the proposed insert was mailed with the sample ballots in May 2010, and the election was held in June 2010. Therefore, the relief sought in Kunde's petition is no longer available. "[A]ppellate courts as a rule will not render opinions on moot questions: '[W]hen, pending an appeal from the judgment of a lower court, and without fault of the [respondent], an event occurs which renders it impossible for [the reviewing court] if it should decide the case in favor of [appellant], to grant [appellant] any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.'" (*Ebensteiner Co., Inc. v. Chadmar Group* (2006) 143 Cal.App.4th 1174, 1178–1179 [49 Cal.Rptr.3d 825].)

However, as the Party also notes, an exception to the doctrine of mootness exists where the issues presented "are of general public interest and likely to recur." (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 481 [14 Cal.Rptr.2d 455, 841 P.2d 975] (*Clark*).) This exception is often applied in election cases. " 'Under certain conditions, disputes concerning election procedures are properly reviewable by an appellate court even though the particular election in question has already taken place.' [Citation.] Even though the relief requested is no longer available, review may be appropriate if the contentions raised are of general public interest 'and are likely to occur in future elections in a manner evasive of timely appellate review.' " (*Huening v. Eu* (1991) 231 Cal.App.3d 766, 770 [282 Cal.Rptr. 664]; see also *Unger v. Superior Court* (1984) 37 Cal.3d 612, 614 [209 Cal.Rptr. 474, 692 P.2d 238].)

We conclude that the exception is applicable here. The issue of whether an insert included pursuant to section 13305 may contain electioneering materials is a matter of general public interest that is likely to recur in subsequent

elections. Further, because of the short timeframe involved between the mailing of sample ballots and the election, the issue is evasive of timely appellate review.

B. *Kunde Has Standing to Pursue This Appeal*

The Party argued unsuccessfully in the trial court that Kunde lacked standing to bring his petition because he was not beneficially interested in the outcome as required by Code of Civil Procedure section 1086. (Code Civ. Proc., § 1086 [a writ of mandate issues "upon the verified petition of the party beneficially interested"].) The Party renews its standing argument on appeal, advancing it specifically in the context of Kunde's argument that section 13305 is unconstitutional as applied in this case, but not in connection with his argument that the proposed insert was impermissible under section 13305.

The Party argues that because Kunde is "neither a registered voter who has declined to state a party affiliation, nor a Republican candidate allegedly not endorsed in the [proposed insert]," Kunde's own "right to vote, speak or associate" has not been injured by the inclusion of the proposed insert. The Party contends that, therefore, Kunde is not beneficially interested as required for a petitioner seeking a writ of mandate (Code Civ. Proc., § 1086). The Party also argues that although Kunde contends he has standing as a taxpayer under Code of Civil Procedure section 526a to seek a judgment "restraining and preventing any illegal expenditure of . . . funds" by the county (Code Civ. Proc., § 526a), no additional funds were expended by the Registrar in connection with the proposed insert.[6]

█ We reject the Party's arguments because the Elections Code specifically authorizes a party in Kunde's position to bring a petition for a writ of mandamus. Section 13314, subdivision (a)(1) states that "[a]n elector may seek a writ of mandate alleging that an error or omission has occurred, or is about to occur . . . in the printing of . . . a . . . sample ballot . . . or other official matter, or that any neglect of duty has occurred, or is about to occur." A writ may issue under that provision upon proof that "the error, omission, or neglect is in violation of [the Elections Code] or the Constitution" and "[t]hat

---

[6] Pointing to the language in Code of Civil Procedure section 902 that "[a]ny party aggrieved may appeal . . . ," as authorized by statute, the Party also contends that Kunde is not "a party aggrieved" by the trial court's decision. The argument is without merit. Kunde sought relief from the trial court in the form of a writ preventing the Registrar from including the proposed insert in the sample ballot, and he was therefore aggrieved by a decision denying the relief he sought in the petition. (Cf. *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 [97 Cal.Rptr. 385, 488 P.2d 953] ["One is considered, 'aggrieved' whose rights or interests are injuriously affected by the judgment."].)

issuance of the writ will not substantially interfere with the conduct of the election." (§ 13314, subd. (a)(2).) Here, Kunde is an elector in the election at issue and is in the geographical area covered by the proposed insert. Consistent with section 13314, Kunde's petition alleges that the Registrar has neglected her duty to reject the proposed insert, and he bases his petition on alleged violations of the Elections Code and constitutional provisions. Therefore, Kunde has standing to pursue this action based on section 13314.[7]

## C. Standard of Review

The applicable facts are not in dispute, and the sole issues before us are legal questions concerning the interpretation of section 13305 and its constitutionality as applied here. We therefore apply a de novo standard of review. (*Carson Citizens for Reform v. Kawagoe* (2009) 178 Cal.App.4th 357, 366 [100 Cal.Rptr.3d 358] [statutory interpretation]; *Alviso v. Sonoma County Sheriff's Dept.* (2010) 186 Cal.App.4th 198, 204 [111 Cal.Rptr.3d 775] [as-applied constitutional challenge].)

## D. Section 13305 Does Not Prohibit Electioneering Materials

We first address Kunde's contention that the proposed insert was not authorized by section 13305 because electioneering materials are not permitted to be included in the one-page letter or contributor envelope allowed by that provision.

---

[7] In the trial court, the Party argued that Kunde had failed to name an indispensible party—namely the Secretary of State—on the basis that section 13314 states that in a petition for a writ of mandate filed pursuant to that section, "[t]he Secretary of State shall be named as a respondent or a real party in interest in any proceeding under this section concerning a measure or a candidate described in Section 15375, except for a candidate for judge of the superior court." (*Id.*, subd. (a)(4).) Section 15375 lists candidacies for various offices and all statewide measures. The trial court rejected that argument, explaining that Kunde's challenge to the proposed insert did not constitute a proceeding concerning a measure or candidate, and that the Secretary of State would not be required to take any action if Kunde were granted relief. Making a different indispensible party argument, the Party includes a footnote in its appellate brief to the effect that the action should be dismissed because Kunde did not name the Secretary of State as a defendant in a suit challenging the constitutionality of section 13305. Citing *Wolfe v. City of Fremont* (2006) 144 Cal.App.4th 533, 551 [50 Cal.Rptr.3d 524], the Party bases its argument on the assertion that " 'in actions for declaratory and injunctive relief challenging the constitutionality of state statutes, state officers with statewide administrative functions under the challenged statute are the proper parties defendant.' " (*Ibid.*, quoting *Serrano v. Priest* (1976) 18 Cal.3d 728, 752 [135 Cal.Rptr. 345, 557 P.2d 929].) As this is a different ground for relief from that presented to the trial court, it is improperly presented to us for the first time on appeal, and for that reason we decline to address it. (See *Jermstad v. McNelis* (1989) 210 Cal.App.3d 528, 538 [258 Cal.Rptr. 519] ["a claim of error in failing to join . . . an absent party is not cognizable on appeal unless it is appropriately raised in the trial court or there is some compelling reason of equity or policy which warrants belated consideration"].)

■ The issue before us requires that we interpret section 13305. When interpreting a statute "we look first to the words of the statute, ' "giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose." ' . . . Although we give effect to a statute according to the usual, ordinary import of its language . . . , language that permits more than one reasonable interpretation allows us to consider 'other aids, such as the statute's purpose, legislative history, and public policy.' " (*Cortez v. Abich* (2011) 51 Cal.4th 285, 292 [120 Cal.Rptr.3d 520, 246 P.3d 603], citations omitted.)[8]

### 1. *The Plain Language of Section 13305 Contains No Prohibition on Electioneering Materials*

Kunde contends that "[s]ection13305's plain meaning is readily apparent— the statute establishes a narrowly defined method by which political parties can solicit contributions from their members . . . ," and thus no electioneering content is permitted. To support his narrow interpretation of the statute, Kunde points out that "[t]he statutory text does not mention candidate endorsements, ballot measure advocacy, or any other form of electioneering." In essence, Kunde argues that because section 13305 does not expressly permit electioneering materials, they are prohibited.

As we will explain, neither the statutory language nor basic principles of statutory interpretation support Kunde's reading of the statute. On the contrary, as the trial court sensibly pointed out, the statute's plain language supports the opposite conclusion: because the Legislature chose to specify certain material that was *not* permitted in the one-page letter, all other content *is* permitted even if not specifically identified in the statute.

■ Section 13305's only reference to the content of the one-page letter or contributor envelope permitted by that section appears in subdivision (b), which states: "Each envelope or letter shall contain a space for the name and address of the contributor, and shall contain language which informs the contributor of the manner in which the money received shall be spent. The language on the envelope or letter shall not contain words critical of any other political party." (§ 13305, subd. (b).) The presence of this language

---

[8] In addition, as Kunde points out, "[a] statute should be construed whenever possible so as to preserve its constitutionality." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) In part II.E., *post*, we discuss whether section 13305 is constitutional when interpreted to allow the inclusion of electioneering materials on the one-page letter or contributor envelope. In that part we conclude that the statute, as interpreted, is constitutional. Therefore, we have no occasion to apply the principle that a statute should be interpreted, where possible, to preserve its constitutionality.

establishes that in drafting the statute, the Legislature considered restrictions on the content of the one-page letter or contributor envelope, and determined that the only restriction that should be imposed is a ban on words critical of any other political party. The Legislature did not identify electioneering materials as prohibited content. Indeed, the Legislature's decision to specify that the language on the envelope or letter shall not contain words critical of any other political party shows that the Legislature expected that the letter or envelope would contain partisan political advocacy instead of being limited to a bare solicitation for contributions.

■ Applicable here is the "principle, commonly known under the Latin name of *expressio unius est exclusio alterius,* . . . that the expression of one thing in a statute ordinarily implies the exclusion of other things." (*In re J. W.* (2002) 29 Cal.4th 200, 209 [126 Cal.Rptr.2d 897, 57 P.3d 363].) " '[I]f a statute enumerates the persons or things to be affected by its provisions, there is an implied exclusion of others . . . . It is an elementary rule of construction that the expression of one excludes the other. And it is equally well settled that the court is without power to supply an omission.' " (*CPF Agency Corp. v. Sevel's 24 Hour Towing Service* (2005) 132 Cal.App.4th 1034, 1049 [34 Cal.Rptr.3d 120].) " 'Under the standard rules of statutory construction, we will not read into the statute a limitation that is not there.' " (*Suarez v. Pacific Northstar Mechanical, Inc.* (2009) 180 Cal.App.4th 430, 443 [103 Cal.Rptr.3d 168].) The Legislature expressly included the restriction on words critical of another political party, and although it could have, it did not include a restriction on electioneering materials. Therefore, we imply that other content restrictions are excluded.

Further, even were we to accept, as Kunde argues, that the statute's sole purpose is to give political parties a method *to solicit contributions* from their members, the inclusion of electioneering materials is not necessarily inconsistent with that purpose. As explained in a declaration submitted by the Party's executive director in support of the Party's opposition to the writ petition, there is a direct connection between the electioneering materials and the Party's solicitation of contributions. "The purpose of these endorsements is to demonstrate to voters that the [Party] supports candidates and measures that reflect the [Party's] ideals, principles and values, and that their contributions will be well spent on the support of such candidates and measures." This strategy appears to be a reasonable method of soliciting contributions, and nothing in the statutory language prohibits it. Therefore, we are not persuaded that merely because the statute appears to exist for the purpose of facilitating the solicitation of contributions, those solicitations cannot also contain electioneering materials. The Legislature wisely has left the content of the solicitations to the judgment of the local political parties, who are in the best position to determine an effective solicitation strategy.

### 2. Because the Registrar Neither Expended Public Funds nor Promoted a Partisan Position, We Need Not Require a Clear and Explicit Legislative Statement Allowing Electioneering Materials

Kunde also rests his statutory interpretation on the principle set forth in *Stanson v. Mott* (1976) 17 Cal.3d 206 [130 Cal.Rptr. 697, 551 P.2d 1] (*Stanson*), that absent a "clear and explicit legislative authorization, a public agency may not expend public funds to promote a partisan position in an election campaign." (*Id.* at pp. 209–210.) Based on this principle, Kunde argues that we may not interpret section 13305 to permit the inclusion of electioneering materials in a political party's one-page letter or contributor envelope unless we conclude that the statute contains a clear and explicit authorization of such materials. As we will explain, the principle set forth in *Stanson* is not applicable here.

*Stanson* considered allegations that the director of the state Department of Parks and Recreation had authorized the agency to spend public funds to promote the passage of a bond issue that would fund the acquisition of parkland. (*Stanson, supra,* 17 Cal.3d at pp. 209, 211.) *Stanson* recited both the "general principle that expenditures by an administrative official are proper only insofar as they are authorized, explicitly or implicitly, by legislative enactment" (*id.* at p. 213), and the more specific principle that an agency may not expend funds for "partisan campaign purposes" (*id.* at p. 217) unless such authorization is given " '*in clear and unmistakable language*' " (*id.* at p. 216). *Stanson* found no such clear and unmistakable language in any of the statutory provisions authorizing the Department of Parks and Recreation to spend funds, and thus it concluded that the agency could not "spend public funds to campaign for the passage of the bond issue." (*Id.* at p. 220.) As we will explain, *Stanson* does not apply because the Registrar neither (1) expended public funds nor (2) promoted a partisan position in allowing the proposed insert in the sample ballot.

First, as explicitly required by section 13305 itself, the inclusion of the proposed insert did not involve the expenditure of public funds. The Party paid for all the costs of printing the proposed insert, and it would have been required to pay for additional postage costs had any been incurred. Because there was no expenditure of public funds, *Stanson* does not apply. (See *Keller v. State Bar* (1989) 47 Cal.3d 1152, 1171 [255 Cal.Rptr. 542, 767 P.2d 1020] (*Keller*) [speech by bar president with the primary purpose of assisting in the retention campaign of justices was not covered by *Stanson* because "[t]he speech itself . . . cost the State Bar nothing . . . ," but press releases and educational materials that the bar paid to publish were covered].)

Kunde argues at length that by permitting a political party to include in the sample ballot mailing a one-page letter or contributor envelope containing

electioneering materials, the Registrar is affording that political party "a substantial economic subsidy," in that the Party is not required to pay its own funds to mail electioneering materials to its members. However, the argument is misplaced. *Stanson* discusses the circumstances in which a public agency is authorized to expend public funds. Because no expenditure of funds is involved here, *Stanson* is not applicable regardless of whether the Registrar has, as Kunde argues, conferred a valuable privilege on the Party and saved it from spending its own funds on a mailing.[9]

 Second, the Registrar did not promote a partisan position by allowing the Party to include the proposed insert in the sample ballot mailing. As our Supreme Court has explained, "[a] full reading of the *Stanson* decision reveals . . . that our opinion's statement that the government 'may not "take sides" in election contests' . . . properly must be understood as singling out a public entity's 'use of the public treasury *to mount an election campaign*' . . . ." (*Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 36 [92 Cal.Rptr.3d 286, 205 P.3d 207], citations omitted (*Vargas*).) It further explained that "the threat to the fairness of the electoral process to which *Stanson* referred arises when a public entity or public official is able to devote funds from the public treasury, or the publicly financed services of public employees, to *campaign activities* favoring or opposing" a pending ballot measure. (*Vargas*, at pp. 36–37.) Our inquiry is whether the public agency engaged in "a form of prohibited election campaigning," the purpose of which was "to assist in the election campaign." (*Keller, supra*, 47 Cal.3d at p. 1172.)

The Registrar's inclusion of the proposed insert in the sample ballot mailing does not amount to the Registrar " '*mount[ing] an election campaign*' " (*Vargas, supra*, 46 Cal.4th at p. 36), and there is no indication that the Registrar intended to "assist in the election campaign." (*Keller, supra*, 47 Cal.3d at p. 1172.) Instead, section 13305 operates on a nonpartisan and neutral basis. The Registrar has no involvement in selecting the message contained in the communications made by the political parties to their registered voters, and the proposed insert at issue here states multiple times that it is from the Party, and that it was paid for by the Party. Under these circumstances, the Registrar does not "promote a partisan position in an election campaign" (*Stanson, supra*, 17 Cal.3d at pp. 209–210) by allowing a political party, pursuant to section 13305, to include a one-page letter or contributor envelope containing electioneering materials in a sample ballot mailing.

Therefore, because *Stanson* does not apply, we reject Kunde's argument that absent a clear and explicit statutory authorization, section 13305 does not

---

[9] Kunde's argument that the Registrar conferred a valuable privilege on the Party is more properly analyzed as part of Kunde's constitutional argument, which we discuss below.

permit the inclusion of electioneering materials in a political party's one-page letter or contributor envelope.

### 3. *The Statutory and Constitutional Provisions That Kunde Cites Do Not Support His Interpretation of Section 13305*

Apart from his reliance on *Stanson,* Kunde points to other statutory provisions and a provision of the state Constitution to support his interpretation of section 13305.

First, Kunde relies on Government Code section 54964, subdivision (a), which states that "[a]n officer, employee, or consultant of a local agency may not expend or authorize the expenditure of any of the funds of the local agency to support or oppose the approval or rejection of a ballot measure, or the election or defeat of a candidate, by the voters."[10] However, this does not apply because—as we have explained—the Registrar did not expend funds on the proposed insert.

■ Second, Kunde cites section 13307, subdivision (a)(1), which states that in the context of an election for a nonpartisan office—such as the local contests described in the proposed insert—the candidate's statement appearing in the sample ballot "shall not include the party affiliation of the candidate, nor membership or activity in partisan political organizations." He argues that if section 13305 is interpreted to allow electioneering materials, it would effectively vitiate the proscription on a candidate for a nonpartisan office including his or her party affiliation. We disagree. Section 13307, subdivision (a)(1) concerns the content of candidate statements, which is a separate matter from the permissible content of a letter from a political party with whom the recipient is registered. Section 13305 has no bearing on the content of a candidate's statement.

---

[10] Kunde also refers to Education Code section 7054, subdivision (a), which states that "[n]o school district or community college district funds, services, supplies, or equipment shall be used for the purpose of urging the support or defeat of any ballot measure or candidate, including, but not limited to, any candidate for election to the governing board of the district." That provision is not applicable here because no school district or community college resources are at issue. Similarly, Kunde argues that our Supreme Court's interpretation of Education Code section 7054, subdivision (a) in *San Leandro Teachers Assn. v. Governing Bd. of San Leandro Unified School Dist.* (2009) 46 Cal.4th 822 [95 Cal.Rptr.3d 164, 209 P.3d 73] is pertinent here. We disagree. *San Leandro* concluded that Education Code section 7054, subdivision (a) justified a school district's refusal to allow a union to access internal faculty mailboxes for political purposes, reasoning that the faculty mailboxes constituted school " 'equipment' " within the meaning of the statute. (*San Leandro,* at p. 835.) No comparable statute applies in an elections context. As we have explained, the pertinent inquiry under Government Code section 54964, subdivision (a) is whether there has been an expenditure of local agency funds.

■ Finally, Kunde points to a provision of the California Constitution, which states that "[a] political party or party central committee shall not nominate a candidate for nonpartisan office, and the candidate's party preference shall not be included on the ballot for the nonpartisan office." (Cal. Const., art. II, § 6, subd. (b).) He argues that if section 13305 was interpreted to allow electioneering materials related to nonpartisan candidates, a political party would in effect be able to nominate its preferred candidate. We disagree. A political party does not "nominate" anyone by approving of a candidate in electioneering materials. Instead, it *endorses* that candidate by expressing support and approval, which is a separate activity from *nominating* a candidate.[11]

■ In sum, we reject Kunde's proposed interpretation of section 13305, and conclude that the one-page letter or contributor envelope included with the sample ballot may, like the proposed insert, contain electioneering materials taking a position on election contests.

### E. *Kunde's As-applied Constitutional Challenge Lacks Merit*

Kunde argues that when section 13305 is interpreted to allow a political party to include electioneering materials in the sample ballot sent to its registered voters, the statute—as applied—violates both the First Amendment to the United States Constitution and the Fourteenth Amendment's equal protection clause.[12]

---

[11] Significantly, the California Constitution previously stated that "[n]o political party or party central committee may endorse, support or oppose a candidate for nonpartisan office." (Cal. Const., former art. II, § 6, subd. (b).) However, in 1996 that provision was held to be unconstitutional in violation of the First Amendment to the United States Constitution, as *endorsement* of candidates was protected as core political speech. (*California Democratic Party v. Lungren* (1996) 919 F.Supp. 1397, 1399.) Therefore, the law currently prohibits only *nomination* of candidates, not *endorsement*.

[12] In an undeveloped footnote, Kunde refers to the California Constitution's free speech clause as another basis for his argument. (Cal. Const., art. I, § 2, subd. (a).) However, because the reference to the state Constitution is undeveloped, without reliance on case law or specific argument, we will not consider it. (See *Clark, supra,* 4 Cal.4th at pp. 481–482 [in constitutional challenge to election law provision, a party's "passing reference" to the Cal. Const., as opposed to the federal Const., was a "pro forma claim" that did not warrant discussion].) Even were we to consider the California Constitution, the analysis would be substantially the same as under the federal Constitution in this context. Even though in some instances "[t]he California free speech clause is broader and more protective than the First Amendment free speech clause . . . ," that "does not mean that it is broader . . . in all its applications." (*Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 179 [126 Cal.Rptr.2d 727, 56 P.3d 1029].) " '[I]n analyzing constitutional challenges to election laws' " under the state Constitution, our Supreme Court " 'has followed closely the analysis of the United States Supreme Court.' " (*Ibid.*)

1. *Section 13305, As Applied, Does Not Impermissibly Restrict Access to a Limited Public Forum in Violation of the First Amendment*

Kunde's First Amendment argument centers on the contention that section 13305—if interpreted to allow electioneering materials—creates a limited public forum, and that all groups and persons not able to include an insert in the sample ballot mailing are unconstitutionally prohibited from speaking in that forum.

■■■ "The standards that we apply to determine whether a State has unconstitutionally excluded a private speaker from use of a public forum depend on the nature of the forum." (*Good News Club v. Milford Central School* (2001) 533 U.S. 98, 106 [150 L.Ed.2d 151, 121 S.Ct. 2093] (*Good News Club*).) The United States Supreme Court has "sorted government property into three categories. First, in traditional public forums, such as public streets and parks, 'any restriction based on the content of . . . speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest.' [Citation.] Second, governmental entities create designated public forums when 'government property that has not traditionally been regarded as a public forum is intentionally opened up for that purpose'; speech restrictions in such a forum 'are subject to the same strict scrutiny as restrictions in a traditional public forum.' [Citation.] Third, governmental entities establish limited public forums by opening property 'limited to use by certain groups or dedicated solely to the discussion of certain subjects.' " (*Christian Legal Soc. Chapter of Univ. of Cal., Hastings College of Law v. Martinez* (2010) 561 U.S. ___, ___, fn. 11 [177 L.Ed.2d 838, 855, fn. 11, 130 S.Ct. 2971, 2984, fn. 11] (*Christian Legal*).)

■■■ "Recognizing a State's right 'to preserve the property under its control for the use to which it is lawfully dedicated,' . . . the Court has permitted restrictions on access to a limited public forum . . . with this key caveat: Any access barrier must be reasonable and viewpoint neutral . . . ." (*Christian Legal, supra*, 561 U.S. at p. ___ [177 L.Ed.2d at p. 855, 130 S.Ct. at p. 2984], citation omitted.) Specifically, "[t]he restriction must not discriminate against speech on the basis of viewpoint . . . , and the restriction must be 'reasonable in light of the purpose served by the forum . . . .' " (*Good News Club, supra*, 533 U.S. at pp. 106–107, citation omitted.)

The forum at issue here is the mailing, sent by the Registrar, containing the sample ballot. The parties do not agree on whether that mailing is properly characterized as a limited public forum, or rather as a nonpublic forum.[13]

---

[13] The Party supports its position that the mailing containing the sample ballot is a nonpublic forum by citing *Clark, supra*, 4 Cal.4th at page 491 (candidate's statement in a sample ballot is a nonpublic forum). Kunde supports his position that the mailing is a limited

However, we need not resolve that dispute because, as we will explain, even assuming the mailing containing the sample ballot is a limited public forum, the limitations on access to that forum imposed by section 13305 are reasonable and viewpoint neutral.

■ To determine whether a restriction in a limited public forum is viewpoint neutral we look to the rationale behind the restriction. Specifically, we inquire whether "the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." (*Rosenberger v. Rector and Visitors of Univ. of Va.* (1995) 515 U.S. 819, 829 [132 L.Ed.2d 700, 115 S.Ct. 2510].) Here, the restriction is not motivated by the speaker's ideology, opinion or perspective. Section 13305 limits access to the sample ballot mailing in such a way that all qualified political parties with registered members have access to ballots that are mailed to the party's own members. No other groups or persons are permitted to include an insert in those mailings. The statute does not deny access to the sample ballot mailing because of any views held or expressed by the parties who are denied access. Instead, access is denied on the neutral basis that the other groups and persons are not political parties who are qualified to participate in the primary election.[14] In addition, the record contains no evidence section 13305 was motivated by an intent to exclude persons or groups who hold a specific viewpoint or ideology.

Further, the barrier to access is reasonable in light of the apparent purpose of section 13305, which is to facilitate local political parties in communicating with and soliciting contributions specifically from their *own* members. (See *Timmons v. Twin Cities Area New Party* (1997) 520 U.S. 351, 366 [137 L.Ed.2d 589, 117 S.Ct. 1364] (*Timmons*) ["States . . . have a strong interest in the stability of their political systems."].) That purpose would not be served by allowing other groups or persons to have access to the mailings, and it is accordingly reasonable to deny them access.

■ Kunde contends that the limitation in section 13305 permitting only *qualified* political parties to have access to the sample ballot in a primary election mailing is not reasonable. We reject that argument. As we have

public forum by citing *Gebert v. Patterson* (1986) 186 Cal.App.3d 868, 874 [231 Cal.Rptr. 150] (voter information pamphlet contained in sample ballot is a limited public forum) and *Kaplan v. County of Los Angeles* (9th Cir. 1990) 894 F.2d 1076, 1080 (agreeing with *Gebert* that the voter's information pamphlet is a limited public forum).

[14] We reject Kunde's strained argument that by permitting access only to qualified political parties, instead of all persons and groups, section 13305 discriminates based on viewpoint because it excludes those who "eschew affiliation with statewide partisan politics." We find no indication in the statute or the record that the rationale for the restriction on access set forth in section 13305 is to restrict persons or groups who hold a certain viewpoint concerning statewide partisan politics.

explained (see fn. 3, *ante*), section 5100 states that only *qualified* political parties, as defined therein, may participate in primary elections. In light of this provision, only members of *qualified* political parties receive mailings of sample ballots unique to their party in primary elections, and a one-page letter or contributor envelope from the member's political party is easily included in those unique sample ballots. It is therefore reasonable for the Legislature to have decided to give only *qualified* political parties access to include one-page letters or contributor envelopes in the mailing containing primary election sample ballots.[15]

> 2. *Section 13305, As Applied, Does Not Unconstitutionally Burden the First Amendment or Equal Protection Rights of Persons and Groups Not Permitted Access to the Sample Ballot Mailing*

The next issue is whether, as Kunde contends, section 13305, as applied, violates the equal protection rights of groups and persons who are not permitted access to the sample ballot mailing. According to Kunde, by permitting qualified political parties to have the valuable privilege of access to the sample ballot mailing, section 13305 impermissibly favors those parties and, in turn, puts other groups and persons at a disadvantage. Recognizing that his equal protection argument also depends on the right of association under the First Amendment, Kunde contends that the equal protection clause of the federal Constitution's Fourteenth Amendment is implicated because it "burden[s] the core political speech activity and associational rights" of excluded groups and persons under the First Amendment. (See *Buckley v. Valeo* (1976) 424 U.S. 1, 15 [46 L.Ed.2d 659, 96 S.Ct. 612] ["The First Amendment protects political association as well as political expression."].)[16]

> a. *Applicable Legal Standard*

To address Kunde's argument, we must first determine what analytical approach is applicable. Where, as here, a constitutional challenge in an

---

[15] As counsel for Kunde clarified at oral argument, Kunde is not challenging section 5100's provision permitting only "qualified" political parties to participate in primary elections. Indeed, similar restrictions based on levels of political support have been approved by the Supreme Court. (*American Party of Texas v. White* (1974) 415 U.S. 767, 782–784 [39 L.Ed.2d 744, 94 S.Ct. 1296].)

[16] Although this First Amendment argument overlaps conceptually with Kunde's other First Amendment argument that section 13305 creates a limited public forum from which certain persons and groups are improperly excluded, we view the arguments as different enough that we must analyze them separately. The instant First Amendment challenge focuses on allegations of discriminatory treatment in violation of the right to associate for political purposes, rather than on a lack of access to a public forum. We address the instant argument according to the analytical structure appropriate to it, which as we will explain, is informed by equal protection concepts.

election context draws both on the First Amendment and the equal protection clause, alleging that election laws discriminate against certain persons in the exercise of their associational rights, the United States Supreme Court's approach in recent years has been to apply the analysis set forth in *Anderson v. Celebrezze* (1983) 460 U.S. 780, 789 [75 L.Ed.2d 547, 103 S.Ct. 1564] (*Anderson*), premised on the First Amendment, but drawing on equal protection principles. (See *Anderson*, at pp. 786–787, fn. 7 ["we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis" but "rely . . . on the analysis in a number of our prior election cases resting on the Equal Protection Clause"]; *Norman v. Reed* (1992) 502 U.S. 279, 288, fn. 8 [116 L.Ed.2d 711, 112 S.Ct. 698] ["As in *Anderson* . . . 'we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis.' "].)[17]

██ Under *Anderson, supra,* 460 U.S. 780, as later summarized in *Burdick v. Takushi* (1992) 504 U.S. 428, 434 [119 L.Ed.2d 245, 112 S.Ct. 2059] (*Burdick*), "[a] court considering a challenge to a state election law must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.' . . . [¶] Under this standard, the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' . . . But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to

---

[17] As one treatise explains the merging of First Amendment and Equal Protection clause analysis, "It is generally unnecessary to analyze laws which burden the exercise of First Amendment rights by a class of persons under the equal protection guarantee, because the substantive guarantees of the Amendment serve as the strongest protection against the limitation of these rights. Laws which classify persons in their exercise of these rights will have to meet strict tests for constitutionality without need to resort to the equal protection clause. Should the laws survive substantive review under the specific guarantees, they are also likely to be upheld under an equal protection analysis, for they have already been found to represent the promotion of government values which override the individual interest in exercising the specific right." (4 Rotunda & Nowak, Treatise on Constitutional Law: Substance and Procedure (4th ed. 2008) § 18.40, p. 389; see also *Rubin v. City of Santa Monica* (9th Cir. 2002) 308 F.3d 1008, 1019 ["In election cases, free speech and equal protection analyses generally work in tandem."].)

justify' the restrictions." (*Burdick*, at p. 434, citations omitted.) Under this balancing approach, "[n]o bright line separates permissible election-related regulation from unconstitutional infringements on First Amendment freedoms." (*Timmons, supra*, 520 U.S. at p. 359.)

The United States Supreme Court continues to apply the *Anderson* analysis in election law cases. (*Crawford v. Marion County Election Bd.* (2008) 553 U.S. 181, 189–190 [170 L.Ed.2d 574, 128 S.Ct. 1610]; *Washington State Grange v. Washington State Republican Party* (2008) 552 U.S. 442, 451–452 [170 L.Ed.2d 151, 128 S.Ct. 1184] (*Washington State Grange*).) Further, although many of the cases applying the *Anderson* analysis—like *Anderson* itself—dealt with restrictions on access to the ballot, that analysis has also been applied in cases, such as this, where it is alleged that a statute provides an unfair advantage to certain political groups by giving them governmental *benefits* or *subsidies*. (See *Green Party of Michigan v. Land* (E.D.Mich. 2008) 541 F.Supp.2d 912, 915–916 [applying *Anderson* analysis when determining constitutionality of a statute allegedly providing an advantage to certain political parties by providing only them with voter political party preference declarations]; *Moderate Party of Rhode Island v. Lynch* (D.R.I. 2011) 764 F.Supp.2d 373 [applying *Anderson* in a challenge to the constitutionality of statute distributing funds to political parties on an allegedly unequal basis]; *Libertarian Party of Indiana v. Marion County Bd. of Voter Registration* (S.D.Ind. 1991) 778 F.Supp. 1458, 1462–1463 [applying *Anderson* analysis in a challenge to the constitutionality of statute providing that voter registration lists be furnished only to major political parties].)[18]

We therefore turn to an application of *Anderson*'s analytical approach to determine the constitutionality of section 13305, as applied in this case to allow the inclusion of electioneering materials.

### b. *The Constitutional Injury Here, if Any, Is Not Severe*

In conducting the balancing mandated by *Anderson*, the first step is to determine " 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.' " (*Burdick, supra*, 504 U.S. at p. 434.) Kunde contends that, as applied here, "section 13305 imposes a severe burden on the exercise of fundamental speech and associational rights" because (1) "by providing [the

---

[18] Kunde relies on two cases, both of which challenged a federal statute providing bulk rate mail discounts to some political parties, but not others. (*Spencer v. Herdesty* (S.D. Ohio 1983) 571 F.Supp. 444; *Greenberg v. Bolger* (E.D.N.Y. 1980) 497 F.Supp. 756.) These cases were decided either before or very close in time to *Anderson*, and neither of them cite *Anderson* or follow its approach. Therefore, we do not find either of the cases to be persuasive here.

Party] with a valuable electioneering privilege and subsidy . . . , the Registrar effectively amplifies [the Party's] political speech," which in turn burdens those parties that are *not* benefitted and (2) it "distorts the information environment, and burdens the voters' ability to make a free and informed choice."

Our inquiry is whether these are " 'severe' " burdens on First Amendment rights, justifying the application of a higher level of scrutiny (*Burdick, supra,* 504 U.S. at p. 434), or are only "modest burdens" of a " 'reasonable, nondiscriminatory' " nature (*Washington State Grange, supra,* 552 U.S. at p. 452). As we will explain, we conclude that the burden here on First Amendment rights, if it exists at all, is light.

First, as to the contention that the speech and associational rights of other groups and persons are burdened because the Party has been given a valuable privilege, we do not view the burden as being severe. Although they are denied access to the privilege of participating in the sample ballot mailing, other groups and persons are still able to campaign fully through their own mailings and other means of expression, and are not subject to any other restrictions. In one case where the Supreme Court concluded that the burden on First Amendment rights was not severe, it pointed out that the challenged laws, "do not restrict the ability of [the allegedly burdened political party] and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the party's access to the ballot. They are silent on parties' internal structure, governance, and policymaking. . . . They also limit, slightly, the party's ability to send a message to the voters and to its preferred candidates." (*Timmons, supra,* 520 U.S. at p. 363.) The same is true here.

Further, any burden on the First Amendment rights of other groups and persons is " 'reasonable' " and " 'nondiscriminatory.' " (*Burdick, supra,* 504 U.S. at p. 434; *Washington State Grange, supra,* 552 U.S. at p. 452.) There is no indication of any intention to discriminate against other persons and groups by giving political parties access to the sample ballot mailing to communicate with their members. And, as we have discussed above in connection with the limited public forum issue, it is reasonable for section 13305 to restrict other persons and groups from access to the sample ballot mailing because the apparent purpose of section 13305 is to allow political parties to communicate with and raise funds from their *own* members, in the mailing of a unique sample ballot sent only to those members. That purpose would not be served by granting access to other persons and groups.

Second, we reject the premise of Kunde's argument that section 13305, as applied, severely burdens First Amendment rights because it "distorts the information environment, and burdens the voters' ability to make a free and informed choice." Section 13305 does nothing to impede the voter's ability to make a free and informed choice because it does not keep any candidate or measure off the ballot, and all groups and persons remain free to communicate with the voters in any manner available to them.

In sum, conducting the first step of the analysis identified in *Anderson*, we conclude that any burden to First Amendment rights created by section 13305, as applied, is—at most—only modest, and is reasonable and nondiscriminatory.

### c. *Sufficient State Interests Support Any Burden on First Amendment Rights Imposed by Section 13305*

The next analytical step is to determine whether " 'the State's important regulatory interests are generally sufficient to justify' the restrictions." (*Burdick, supra*, 504 U.S. at p. 434.) "[T]he State's asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the party's rights. . . . Nor do we require elaborate, empirical verification of the weightiness of the State's asserted justifications." (*Timmons, supra*, 520 U.S. at p. 364, citation omitted.)

Here, as we have explained, the purpose of section 13305 appears to be the facilitation of a political party's communication and solicitation of contributions from its members. As the Party explains, this serves the legitimate state interest of increasing political participation and promoting the vibrancy of the political system. "States . . . have a strong interest in the stability of their political systems." (*Timmons, supra*, 520 U.S. at p. 366.) That interest is served by section 13305's facilitation of a political party's ability to communicate with and solicit funds from its members. We therefore conclude that the Legislature's purpose in enacting section 13305 is sufficient to justify any burden that it creates on the associational rights of groups and persons not permitted to participate in the sample ballot mailing.

In sum, section 13305, as interpreted to permit electioneering materials, is constitutional under the balancing approach set forth in *Anderson*, and we thus reject Kunde's contention that the Registrar's application of the statute violated the equal protection clause by unfairly burdening the First Amendment associational rights of persons and groups not permitted to include an insert in the sample ballot mailing.

## DISPOSITION

The judgment is affirmed.

McIntyre, Acting P. J., and O'Rourke, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 26, 2011, S195849.